## IN THE UNITED STATES DISTRICT COURT FOR
## THE EASTERN DISTRICT OF VIRGINIA
### - Alexandria Division -

| | |
|---|---|
| **ESTATE OF SABAH SALMAN HASSOON,** **et al.,** | **Case No. 1:09-cv-615** |
| | **Case No. 1:09-cv-616** |
| **Plaintiffs** | **Case No. 1:09-cv-617** |
| | **Case No. 1:09-cv-618** |
| **v.** | **Case No. 1:09-cv-645** |
| | **(consolidated for pretrial purposes)** |
| **ERIK PRINCE, et al.,** | **(TSE/IDD)** |
| **Defendants** | |

### PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS

Susan L. Burke (VA Bar # 27769)
Burke O'Neil LLC
1000 Potomac Street, Suite 150
Washington, DC 20007
202.445.1409

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ..................................................................... iii

TABLE OF EXHIBITS.......................................................................... xvi

STATEMENT OF ALLEGATIONS AND FACTS ............................................1

ARGUMENT ................................................................................... 13

I.   MR. PRINCE AND THE COMPANIES ACTING AS HIS ALTER EGO
     SHOULD NOT BE DISMISSED ................................................... 14

II.  PLAINTIFFS STATE VALID FEDERAL RACKETEERING CLAIMS
     AGAINST ERIK PRINCE .......................................................... 18

     A.   Plaintiffs Alleged Erik Prince Perpetrated a Pattern of Related
          Acts of Racketeering ...................................................... 20

          1.   Plaintiffs allege Defendant Erik Prince perpetrated multiple
               predicate acts of murder .......................................... 21

          2.   Plaintiffs allege Erik Prince established an enterprise that
               engaged in a pattern of related racketeering acts ............... 27

               (a)   Establishing an enterprise ..................................... 27

               (b)   Pleading a pattern.............................................. 28

     B.   The RICO Plaintiffs Have Standing to Assert RICO Claims................ 30

     C.   Defendant Erik Prince's Misconduct Occurred in the United States.......... 32

III. PLAINTIFFS STATE VALID FEDERAL COMMON LAW TORT
     CLAIMS FOR WAR CRIMES AND SUMMARY EXECUTION................... 33

     A.   The Federal Common Law Under ATS Provides for Civil Liability
          for War Crimes and Summary Execution...................................... 34

     B.   Federal Common Law May Be Based on the Federal Criminal War
          Crimes Statute and Customary International Law.............................. 37

     C.   Defendant Prince and the Alter Ego Companies are Not Excused
          from Liability for War Crimes And Summary Execution Merely
          Because They are Private Parties, Not Government Officials ................. 39

IV.  PLAINTIFFS PROPERLY PLEAD THE FACTS NECESSARY FOR
     LIABILITY................................................................................ 41

     A.   Plaintiffs Properly Plead Facts Establishing Mr. Prince's Direct
          Liability............................................................................... 41

     B.   The Prince Companies May Be Held Liable for Committing War
          Crimes and Summary Execution .............................................. 44

i

V.      PUNITIVE DAMAGES ARE AVAILABLE FOR VICTIMS OF WAR
        CRIMES AND SUMMARY EXECUTION…………………………………… 45

VI.     PLAINTIFFS ASSERT VALID STATE COMMON LAW CLAIMS  NOT
        BARRED BY ANY DOCTRINE OR LAW…………………………………… 47

        A.      These Lawsuits Do Not Raise a Political Question…...…………………… 48

                1.      This lawsuit does not challenge matters demonstrably and
                        textually committed in the Constitution to the Executive
                        Branch……………………………………………………………… 52

                2.      None of the other five Baker factors is present……...……………… 54

VII.    THE GOVERNMENT CONTRACTOR AFFIRMATIVE DEFENSE DOES
        NOT APPLY HERE……………………………………………………..……… 57

VIII.   THE UNITED STATES' ABSOLUTE IMMUNITIES DO NOT PROTECT
        MR. PRINCE AND HIS BLACKWATER COMPANIES…………………..……… 59

IX.     IT IS PREMATURE TO RULE ON CHOICE OF LAW ISSUES………..……… 61

        A.      Iraqi Law May Be Applied and Does Not Bar These Claims………..…...……… 64

                1.      The Bremer Order contemplates lawsuits such as these
                        proceeding in United States' courts………………………………..… 64

                2.      Iraqi law permits Plaintiffs' claims………………………………… 65

                3.      This Court has the power to ensure Plaintiffs have a remedy……… 67

        B.      None of the Plaintiffs Lacks Capacity To Sue……………………………...… 68

        C.      Discovery is Needed Before The Court Rules on Whether Any
                Plaintiffs are Time-Barred …………………………………………………… 69

        D.      Even if Virginia Statutory Law Applies, Plaintiff Wijdan Mohsin
                Saed is Not Time-Barred…………………………………………………….... 70

CONCLUSION……………………………………………………………………………..71

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Abdullahi v. Pfizer, Inc.,*
    562 F.3d 163 (2d Cir. 2009) ..........................................................................- 47 -

*Abebe-Jira v. Negewo,*
    72 F.3d 844 (11th Cir. 1996) .........................................................................- 46 -

*Adamson v. Alliance Mtg. Co.,*
    677 F. Supp. 871 (E.D. Va. 1987) .................................................................- 30 -

*Aldana v. Del Monte Fresh Produce, N.A., Inc.,*
    416 F.3d 1242 (11th Cir. 2005) .....................................................................- 43 -

*Alejandre v. Republic of Cuba,*
    996 F. Supp. 1239 (S.D. Fla. 1997) ..............................................................- 40 -

*Almog v. Arab Bank, PLC,*
    471 F. Supp. 2d 257 (E.D.N.Y. 2007) ..........................................................- 37 -

*Anderson v. Foundation for the Advancement, Education and Employment of American Indians,*
    155 F.3d 500 (4th Cir. 1998) .........................................................................- 29 -

*Argentine Republic v. Amerada Hess Shipping Corp.,*
    488 U.S. 428 (1989) .......................................................................................- 47 -

*Arias v. Dyncorp,*
    517 F. Supp. 2d 221 (D.D.C. 2007) ..............................................................- 48 -

*Ashcroft v. Iqbal,*
    129 S. Ct. 1937 (2009) ...................................................................- 2 -, - 19 -

*Bailet v. MacDonnell Douglas Corp.,*
    989 F.2d 794 (5th Cir. 1993) .........................................................................- 58 -

# TABLE OF AUTHORITIES
## (continued)

*Baker v. Carr,*
  369 U.S. 186, 211 (1962).................................................................- 49 -, - 51 -, - 55 -, - 56 -

*Barron v. Martin-Marietta Corp.,*
  868 F. Supp 1203, 1207 (N.D. Cal. 1994) .........................................................- 58 -

*Bast v. Cohen, Dunn & Sinclair PC,*
  59 F.3d 492 (4th Cir. 1995)...........................................................................- 20 -, - 31 -

*Beanal v. Freeport-McMoran, Inc.,*
  197 F.3d 161 (5th Cir. 1999) ...........................................................................- 47 -

*Beck v. Prupis,*
  529 U.S. 494 (2000)...........................................................................................- 45 -

*Berkovitz v. United States,*
  486 U.S. 531 (1988)...........................................................................................- 52 -

*Bolchos v. Darrel,*
  3 F. Cas. 810 (D.C.S.C. 1795) .........................................................................- 42 -

*Boumediene v. Bush,*
  128 S.Ct. 2229 (2008).......................................................................................- 50 -

*Bowoto v. Chevron Corp.,*
  557 F. Supp. 2d 1080 (N.D. Cal. 2008) ...........................................................- 43 -

*Boyle v. United Technologies Corp.,*
  487 U.S. 500 (1988)..............................................................................- 57 -, - 58 -, - 60 -

*Brandenburg v. Seidel,*
  859 F.2d 1179 (4th Cir. 1988) .........................................................................- 29 -

*Burlington Indus., Inc. v. Ellerth,*
  524 U.S. 742 (1998)...........................................................................................- 45 -

iv

# TABLE OF AUTHORITIES
## (continued)

*Busby v. Crown Supply, Inc.,*
    896 F.2d 833 (4th Cir. 1990) ............................................................- 22 -

*Butte Mining PLC v. Smith,*
    76 F.3d 287 (9th Cir. 1996).................................................- 32 -, - 28 -

*Byrd v. Hopson,*
    265 F. Supp. 594 (W.D. N.C. 2003) ...............................................- 31 -

*C.M. English v. Pabst Brewing Co.,*
    828 F.2d 1047 (4th Cir. 1987).......................................- 71 -, -74-

*Cabello v. Fernandez-Larios,*
    402 F.3d 1148 (11th Cir. 2005)........................................- 37 -, - 46 -

*Carmichael v. Kellogg, Brown & Root Servs., Inc.,*
    No. 08-14487, F.3d, 2009 WL 1856537 (11th Cir. June 30, 2009)........................- 50 -, - 53 -

*Chisholm v. Transouth Financial Corporation,*
    95 F.3d 331 (4th Cir. 1996) ............................................................- 21 -

*City of Bedford v. James Leffel & Co.,*
    558 F.2d 216 (4th Cir. 1977) ...........................................................- 71 -

*Converse v. General Motors Corp.,*
    893 F.2d 513 (2d Cir. 1990)...........................................................- 69 -

*Cuba v. Sabbatino,*
    376 U.S. 398 (1964)......................................................................- 41 -

*Dames & Moore v. Regan,*
    453 U.S. 654 (1981)......................................................................- 50 -

## TABLE OF AUTHORITIES
### (continued)

*Davidson v. Enstar Corp.,*
  848 F.2d 574 (5th Cir. 1988) ........................................................................- 45 -

*De Falco v. Bernas,*
  244 F.3d 286 (2d Cir. 2001)...........................................................................- 28 -

*Densberger v. United Technologies Corp.,*
  297 F.3d 66 (2d. Cir. 2002)............................................................................- 58 -

*Doe v. Exxon Mobil Corp.,*
  473 F.3d 345 (D.C. Cir. 2007) .......................................................................- 58 -

*Doe v. McMillan,*
  93 S.Ct. 2018 (1973)......................................................................................- 63 -

*EPlus Technology, Inc. v. Aboud,*
  313 F.3d 166 (4th Cir. 2002) .........................................................................- 20 -

*Exxon Shipping Co. v. Baker,*
  128 S.Ct. 2605 (2008).....................................................................................- 46 -

*Filartiga v. Pena-Irala,*
  577 F. Supp. 860 (E.D.N.Y. 1984) ................................................................- 49 -

*Flynn v. Shultz,*
  748 F.2d 1186, 1191 (7th Cir. 1984), cert. denied, 474 U.S. 830 (1985).........................- 55 -

*Foremost Corp. v. Meritor Savs. Bank,*
  910 F.2d 118 (4th Cir. 1990) .........................................................................- 30 -

*Guaranty Trust v. York,*
  326 U.S. 99 (1945)..............................................................................- 69 -, - 70 -

*H.J. Inc. v. Northwestern Bell Telephone Co.,*
  492 U.S. 229 (1989).......................................................................................- 28 -

## TABLE OF AUTHORITIES
### (continued)

*Hamdan v. Rumsfeld,*
  548 U.S. 557 (2006) ...................................................................................- 36 -, - 46 -, -53-

*Hamdi v. Rumsfeld,*
  542 U.S. 507 (2004) ...................................................................................- 50 -

*Hart v. Bates,*
  897 F. Supp. 710 (E.D.N.Y 1995) ...............................................................- 69 -

*Hilao v. Estate of Marcos,*
  103 F.3d 767 (9th Cir. 1996)...........................................................- 37 -, - 49 -

*Holmes v. Securities Investor Protection Corp.,*
  503 U.S. 259 (1992) ...................................................................................- 30 -

*McCulloch v. Sociedad Nacional de Marineros de Honduras*
  372 U.S. 10, 21 (1963) ...............................................................................- 41 -

*Ibrahim v. Titan Corp.,*
  391 F. Supp. 2d 1 (D.D.C. 2005) ................................................................- 58 -

*Illinois v. City of Milwaukee,*
  406 U.S. 91 (1972) .....................................................................................- 37 -

*In re Estate of Ferdinand Marcos Human Rights Litig.,*
  25 F.3d 1467 (9th Cir. 1994) ......................................................................- 40 -

*In re Joint E. & S. Dist. New York Asbestos Litig.,*
  897 F.2d 626 (2nd Cir. 1990).....................................................................- 57 -

*In re South African Apartheid Litigation,*
  617 F. Supp. 2d 228 (S.D.N.Y. 2009)..............................................- 41 -, - 45 -

*International Data Bank v. Zepkin,*
  812 F.2d 149 (4th Cir. 1987) ......................................................................- 29 -

# TABLE OF AUTHORITIES
(continued)

*Jama v. INS,*
　　334 F. Supp. 2d 662 (D.N.J. 2004) ..................................................- 58 -

*James v. Jacobson,*
　　6 F.3d 233, 242 (4th Cir. 1993) .................................................. - 8 -

*John Doe I. v Unocal,*
　　395 F.3d 932 (9th Cir. 2002) .....................................................- 33 -

*Joyner v. Abbott Laboratories,*
　　674 F. Supp. 185 (E.D. N.C. 1987)...............................................- 27 -

*Kadic v. Karadzic,*
　　70 F.3d 232 (2d Cir. 1995)........................................................- 56 -

*Khulumani v. Barclay National Bank, Ltd.,*
　　504 F.3d 254 (2nd Cir. 2007).....................................................- 47 -

*Klinghoffer v. S.N.C. Achille Lauro Ed Altri-Gestione,*
　　937 F.2d 44 (2d Cir. 1991)........................................................- 55 -

*Knauer v. Johns-Manville Corp.,*
　　638 F. Supp. 1369 (D. Md. 1986) ...............................................- 69 -

*Koohi v. United States,*
　　976 F.2d 1328 (9th Cir. 1992) ...................................................- 56 -

*Lane v. Halliburton,*
　　529 F.2d 548 (11th Cir. 2008)..............................................- 51 -, -54-

*Mangold v. Analytic Servs.,*
　　77 F.3d 1442 (4th Cir. 1996)..........................- 56 -, - 57 -, - 60 -, - 61 -

*Marbury v. Madison,*
　　1 Cranch 137, 2 L.Ed. 60 (1803) ...............................................- 49 -

## TABLE OF AUTHORITIES
### (continued)

*McMahon v. Presidential Airways, Inc.,*
   460 F. Supp. 2d 1315 (M.D. Fla. 2006)...................................................................- 12-, - 58 -

*McMahon v. Presidential Airways, Inc.,*
   502 F.3d 1331 (11th Cir. 2007)..............................................................................- 51 -, - 58 -

*Menasco, Inc. v. Wasserman,*
   886 F.2d 681 (4th Cir. 1989) ...........................................................................................- 28 -

*Meyer v. Holley,*
   537 U.S. 280 (2003)...........................................................................................................- 45 -

*Mujica v. Occidental Petroleum Corp.,*
   381 F. Supp. 2d 1164 (C.D. Cal. 2005).................................................................- 37 -, - 49 -

*Murray v. Schooner Charming Betsy,*
   6 U.S. (2 Cranch.) 64 (1804)..................................................................................- 44-, -58-

*The Nereide,*
   9 Cranch 388 (1815) ........................................................................................................- 41 -

*New Beckley Mining Corporation v. International Union,*
   18 F.3rd 1161 (4th Cir. 1994)................................................................................- 22 -, - 31 -

*North South Finance Corp. v. Al-Turki,*
   100 F.3d 1046 (2d Cir. 1996)...........................................................................................- 32 -

*Occidental of Umm al Qaywayn, Inc. v. A Certain Cargo of Petroleum Laden Aboard Tanker,*
   577 F.2d 1196 (5th Cir. 1978) ........................................................................................- 52 -

*Overstreet v. Kentucky Cent. Life Ins. Co.,*
   950 F. 2d 931 (4th Cir. 1991) .........................................................................................- 70 -

*Ownby v. Cohen,*
   19 F. Supp. 2d 558 (W.D. Va. 1998) ..............................................................................- 30 -

## TABLE OF AUTHORITIES
(continued)

*Palmetto State Medical Center Inc. v. Operation Lifeline, et. al.,*
  117 F.3d 142 (4th Cir. 1997)..........................................................................- 20 -, - 21 -, - 28 -

*Paquete Habana,*
  175 U.S. 677, 700 (1900)..........................................................................- 34 -, - 41 -, - 58 -

*Paul v. Avril,*
  901 F. Supp. 330 (S.D. Fla. 1994) ..................................................................................- 46 -

*Philip Morris USA v. Williams,*
  549 U.S. 346 (2007)..........................................................................................................- 46 -

*Potomac Electric Power Company v. Electric Motor and Supply Inc.,*
  262 F.3d 260, 266 (4th Cir. 2001) ...................................................................................- 19 -

*Presbyterian Church of Sudan v. Talisman,*
  244 F. Supp. 2d 289, 347 (S.D.N.Y. 2003)......................................................................- 55 -

*Price v. Litton Business Sys., Inc.,*
  694 F. 2d 963, 965 (4th Cir. 1982) .................................................................................- 71 -

*Provident Life & Acc. Ins. Co. v. Waller,*
  906 F.2d 985, 989 (4th Cir. 1990) ..................................................................................- 37 -

*Raney v. Allstate Insurance Co.,*
  370 F.3d 1086 (11th Cir. 2004) .......................................................................................- 27 -

*Romero v. Drummond Co.,*
  552 F.3d 1303, 1314-16 (11th Cir. 2008) .......................................................................- 47 -

*Sarei v. Rio Tinto, PLC,*
  456 F.3d 1069, 1079-84 (9th Cir. 2006) .........................................................................- 58 -

*Sedima v. Imrex Co.,*
  473 U.S. 479 (1985)...........................................................................................- 19 -, - 30 -

# TABLE OF AUTHORITIES

(continued)

*Smith v. Halliburton Co. (Smith I),*
  No. H-06-0462, 2006 WL 1342823 at *3 (S.D. Tex. 2006) .............................................- 54 -

*Sosa v. Alvarez-Machan,*
  542 U.S. 692 (2004).................................................................................- 34 -, -35 -

*Sterling v. Constantin,*
  287 U.S. 378, 401 (1932)........................................................................- 56 -, - 57 -

*T.B. Harms Co. v. Eliscu,*
  339 F.2d 823, 827-28 (2d Cir.1964) (Friendly, J.), cert. denied, 381 U.S. 915 (1965).....- 37 -

*Terry v. June,*
  420 F.Supp.2d 493, 506 (W.D. Va. 2006) .......................................................- 67 -

*Texas Indus., Inc. v. Radcliff Materials, Inc.,*
  451 U.S. 630, 641 (1981).........................................................................- 41 -

*Tiffany v. United States,*
  931 F.2d 271 (4th Cir. 1991).............................................................- 49  -, - 52 -

*Trust, Inc. v. First Flight Ltd. Partnership,*
  111 F. Supp. 2d 734, 742 (E.D. Va. 2000) ....................................................- 18 -

*United States v. Carrillo,*
  229 F.3d 177, 182 (2d Cir. 2000)...............................................................- 24 -

*United States v. Coonan,*
  938 F.2d 1553 (2d Cir. 1991)...................................................................- 24 -

*United States v. Fidelity and Casualty Co. of New York,*
  402 F.2d 893, 898 (4th Cir. 1968) ............................................................- 71 -

*United States v. Fleming,*
  739 F.2d 945 (4th Cir. 1984).............................................................- 23 -, - 24 -

# TABLE OF AUTHORITIES
(continued)

*United States v. Hooker,*
  841 F.2d 1225 (4th Cir. 1988) .......................................................- 30 -

*United States v. Le,*
  316 F.Supp.2d 355 (E.D. Va. 2004) .............................................- 24 -

*United States v. Licavoli,*
  725 F.2d 1040 (6th Cir. 1984)..............................................- 20 -, - 22 -

*United States v. Lindh,*
  212 F. Supp 2d 541 (E.D. Va. 2002) ...........................................- 50 -

*United States v. Noriega,*
  746 F. Supp. 1506 (S.D. Fla. 1990) .............................................- 33 -

*United States v. Pungitore,*
  910 F.2d 1084 (3d Cir. 1990)......................................................- 20 -

*United States v. Slough, et al.,*
  Case No. 1:08CR00360, (D.D.C., filed Dec. 4, 2009).....................- 53 -

*United States v. Smith,*
  18 U.S. 153, 160-63 (1820) .........................................................- 42 -

*United States v. Williams,*
  342 F.3d 350, 356 (4th Cir. 2003) ................................................- 2 -

*Wade v. Danek Med., Inc.,*
  182 F.3d 281, 289 (4th Cir. 1999) ...............................................- 69 -

*Walker v. Armco Steel Corp.,*
  446 U.S. 740, 750-51 (1980) .......................................................- 69 -

*Weinberger v. Rossi,*
  456 U.S. 25, 29-30, 32-33 (1982) ................................................- 41 -

# TABLE OF AUTHORITIES
### (continued)

*Westfall v. Erwin,*
   108 S.Ct. 580, 583 (1988)......................................................................- 60 -, - 61 -

*Wiwa v. Royal Dutch Petroleum Corp.,*
   226 F.3d 88, 105 (2d Cir. 2000)..............................................................- 37 -

*Wiwa v. Royal Dutch Petroleum Corp.,*
   2009 U.S. Dist. LEXIS 57081 (2009) ....................................................- 39 -

*Wiwa v. Royal Dutch Petroleum,*
   Case No. 96 CIV 8386 2002 WL 319887 (S.D.N.Y.  Feb. 28, 2002) ..............................- 46 -

*Xuncax v. Gramajo,*
   886 F. Supp. 162 (D. Mass. 1995) ..........................................................- 46 -

*Youngstown Sheet & Tube Co. v. Sawyer,*
   343 U.S. 579 (1952)...............................................................................- 50 -

## STATE CASES

*Aldridge v. Commonwealth,*
   606 S.E.2d 539 (Va. App. 2004)..............................................................- 25 -

*Bynum v. Houdaille Indus.,*
   No. WC85-257-LS-D, U.S. Dist. LEXIS 20031 (D. Miss. 1986)....................................- 69 -

*C.F. Trust, Inc. v. First Flight Ltd. Partnership,*
   111 F. Supp. 2d 734, 742 (E.D. Va. 2000) ..............................................- 15 -

*C.I.T Corp. v. Amy Andrews Guy,*
   195 S.E. 659 (Va. 1938)..........................................................................- 67 -

*Cheatle v. Rudd's Swimming Pool Supply Co., Inc.,*
   360 S.E.2d 828 (Va. 1987)......................................................................- 17 -

*Dana v. 313 Freemason,*
   266 Va. 491, 500 (Va. 2003)...................................................................- 15 -

xiii

## TABLE OF AUTHORITIES

(continued)

*Dreher v. Budget Rent-A-Car System, Inc.,*
  634 S.E.2d 324 (Va. 2006) ............................................................- 67 -

*Essex v. Commonwealth,*
  322 S.E.2d 216 (Va. 1984) ............................................................- 25 -

*Maryland v. Coard,*
  9 S.E.2d 454 (Va. 1940) ...............................................................- 67 -

*O'Hazza v. Exec. Credit Corp.,*
  431 S.E.3d 318, 320 (Va. 1993) ...........................................- 15 -, - 17 -

*Pierce v. Commonwealth,*
  115 S.E. 686 (Va. 1923) ................................................................- 25 -

*Porter v. Commonwealth,*
  435 S.E.2d 148 (Va. App. 1993) ....................................................- 35 -

*Pugh v. Commonwealth,*
  292 S.E.2d 339, 341 (Va. 1982) ...........................................- 25 -, - 30 -

*State v. Duboise,*
  181 S.E.2d 393 (S.C. 1971) ...........................................................- 26 -

*State v. Faust,*
  118 S.E.2d 769, 772 ......................................................................- 26 -

*State v. Hamilton,*
  335 S.E.2d 506, 509 ......................................................................- 26 -

*State v. Lang,*
  308 S.E.2d 317 .............................................................................- 26 -

*State v. Mapp,*
  264 S.E.2d 348 .............................................................................- 26 -

xiv

## TABLE OF AUTHORITIES

(continued)

*State v. Miller,*
    543 S.E.2d 201 ............................................................................................- 26 -

*State v. Robbins,*
    309 S.E.2d 188 ............................................................................................- 26 -

*State v. Wilkerson,*
    247 S.E.2d 905 ............................................................................................- 26 -

*T ... v. T ...,*
    224 S.E.2d 148 (Va. 1976)...........................................................................- 75 -

*Toler v. Oakwood Smokeless Coal Corp.,*
    4 S.E.2d 364 (Va. 1939)...............................................................................- 67 -

*Williams v. Commonwealth,*
    2003 Va. App. LEXIS 206 at *6 (Va. App. Apr. 8, 2003) ................................- 25 -

*Williard v Aetna Case. & Sur. Co.,*
    193 S.E.2d 776 (Va. 1973)............................................................................- 67 -

## FEDERAL STATUTES

48 C.F.R. § 252.225-7040(e)(2)(ii)    36

18 U.S.C. § 1111(a) .......................................................................................- 23 -

18 U.S.C. § 1962............................................................................................- 21 -

18 U.S.C. § 2441...............................................................................- 14 -, - 35 -, - 36 -,
    - 53 -

18 U.S.C. §§ 3261(a)(1)........................................................- 4 -, - 9 -, - 12 -, - 13 -,
    49 -

## TABLE OF AUTHORITIES
(continued)

28 U.S.C. § 1331................................................................................- 14 -, - 34 -

28 U.S.C. § 1331.................................................................................- 38 -

28 U.S.C. § 1350.....................................................................- 14 -, - 34 -, - 39 -

28 U.S.C. §1331...................................................................................- 42 -

28 U.S.C. § 2680(A)............................................................................. - 57 -

**STATE STATUTES**

N.C. Gen Stat. § 1-34 (2008) ................................................................- 70 -

Va. Code Ann. § 8.01-243(A)................................................................- 70 -

**FEDERAL RULES**

Fed.R.Civ.P. 26 ...................................................................................- 64 -

Fed.R.Civ.P. 56 ...................................................................................- 64 -

**OTHER AUTHORITIES**

Andrew Finkelman, *Suing The Hired Guns: An Analysis Of Two Federal Defenses To Tort Lawsuits Against Military Contractors*, 32 BROOKLYN J. INT'L. L. 395 N.124 (2009) ..- 60 -

CPA Order 17, § 4(4) (June 27, 2004).....................................................- 64 -, - 65 -

Fourth Geneva Convention Relating to the Protection of Civilians in Time of War (1949)  -35 -

Iraqi Code of Civil Procedure No. (83) of 1969..........................................- 72 -, - 73 -

*Prosecutor v. Kunarac et al*,
    Case Nos. IT-96-23 & IT-96-23/1-A, June 12, 2002.....................................- 35 -

*Prosecutor v. Jelisic*,
    Case No, IT-97-10-A, July 5, 2001.............................................................- 35 -

**TABLE OF AUTHORITIES**
**(continued)**

Suzanne Simons, "Master Of War:  Blackwater's Erik Prince And The Global Business Of War"
   (Harper Collins, June 2009)............................................................................................ - 4 -

Wharton's Criminal Law and Procedure § 245 ....................................................................- 25 -

# TABLE OF EXHIBITS

Excerpts from Suzanne Simons, "Master of War:  Blackwater's Erik
Prince and the Global Business of War" (Harper Collins, June 2009) ............... Exhibit A

Indictment, District Court for the District of Columbia, CR-08-360,
December 4, 2008 (Urbina, J.) ............................................................................... Exhibit B

Factual Proffer in Support of Guilty Plea, Jeremy P. Ridgeway,
November 18, 2008 ................................................................................................ Exhibit C

Information, District Court for the District of Columbia, December 4,
2008 (Urbina, J.) ................................................................................................... Exhibit D

Letter, dated March 30, 2007, from the Internal Revenue Service to
Blackwater Security Consulting LLC, a company wholly owned and
controlled by Erik Prince ...................................................................................... Exhibit E

Letter, dated October 22, 2007, from Henry Waxman, Chair of the
Congressional House of Representatives Committee on Oversight and
Government Reform, to Erik Prince ....................................................................... Exhibit F

Declaration of John Doe No. 1, executed on July 27, 2009 ........................... Exhibit G

Declaration of John Doe No. 2, executed on July 29, 2009 ........................... Exhibit H

Certificate of Incorporation of Greystone Limited under the
Companies Act of Barbados, dated May 13, 2004 ...................................... Exhibit I

Expert Opinion of Dr. Saleem Abdullah Al Juboori, member of the
Iraqi Parliament and Chair of its Legal Committee .................................…... Exhibit J

Expert Opinion of Professor Aziz Jawad Hadi, Professor of Civil Law
and Head of the Department of Private Law, Baghdad University .................... Exhibit K

Expert Opinion of Mr. Fadhil Doulan, former judge and private
attorney practicing in Iraq ....................................................................................Exhibit L

Articles 202-220 of the Iraqi Civil Code ................................................……... Exhibit M

Expert Opinion of Dr. Abdullah F. Ansary and The Honorable Raid Juhi
Al-Saedi, "Report on Iraqi Law:  *Baragona et. al. v. Kuwait Gulf Link
Transport Company et. al.*" ………...……………………………………… Exhibit N

IN THE UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF VIRGINIA
- Alexandria Division -

|  |  |
|---|---|
| **IN RE: BLACKWATER**<br><br>**ALIEN TORT CLAIMS ACT LITIGATION** | **Case No. 1:09-cv-615**<br><br>**Case No. 1:09-cv-616**<br><br>**Case No. 1:09-cv-617**<br><br>**Case No. 1:09-cv-618**<br><br>**Case No. 1:09-cv-645**<br><br>**(consolidated for pretrial purposes) (TSE/IDD)** |

*OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS*

Plaintiffs respectfully request that this Court deny Defendants' Motions To Dismiss and permit Plaintiffs' claims to proceed to discovery and trial.  Defendants mislead the Court by portraying Plaintiffs as challenging the State Department's policies. As explained below, nothing could be further from the truth.  Plaintiffs are challenging Mr. Prince's callous scheme to kill, repeatedly, innocent Iraqis.  This scheme was implemented without the knowledge or consent of the State Department.  This scheme was motivated by Mr. Prince's greed and his racist Christian supremacist views.  Mr. Prince and his Blackwater companies deceived the State Department, and destroyed evidence that might have led to the detection of the scheme.  Mr. Prince's actions, and those of his alter ego companies, should not evade judicial review.  No statutory or decisional law supports Mr. Prince's claim that he is immune from the rule of law.

## STATEMENT OF ALLEGATIONS AND FACTS

In June 2009, Plaintiffs filed five lawsuits in this District. *See* C.A. Nos. 1:09cv 615-18 and 45. Two of these Complaints (*Abtan/617*[1] and *Hassoon/618*) were amended to include allegations of violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), a federal statute permitting private parties to seek redress from criminal enterprises who damage their property. This Section summarizes the most pertinent Complaint allegations and the evidence appended to this Opposition.[2]

### COMPLAINT ALLEGATIONS

These Complaints allege that Defendant Erik Prince ("Mr. Prince" or "Defendant Prince") wholly owns and personally controls all Defendants. *See, e.g.*, *Abtan/617 Compl. ¶¶ 33, 38* (stating "Erik Prince personally controls all the various entities.")

These Complaints allege that Mr. Prince treated the various corporate entities as interchangeable, using whichever corporate form suited his interests. *Rabea/645 Compl. ¶ 21*

---

[1] Plaintiffs' Opposition to Defendants' Motion To Dismiss and Memorandum in Support uses as a shortened reference to each complaint the name of the first Plaintiff and the three digit number civil action number. The full civil action numbers are set forth above in the consolidated caption. The references to "Abtan/617 Compl." and "Hassoon/618 Compl." are references to the First Amended Complaints filed in those actions.

[2] Although Defendants' Motion and Consolidated Memorandum of Law in Support of Their Motions To Dismiss (hereinafter "Prince Mem.") is a Rule 12(b)(6) motion to dismiss, not a motion for summary judgment, Defendants rely on *Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009) and argue for dismissal on the grounds Plaintiffs' allegations are "implausible." Plaintiffs append a modicum of evidence to this Opposition to respond to this argument. Plaintiffs, however, are entitled to, and need, an opportunity for discovery before being able to respond in full to the many Defendants' factual averments. *See, e.g., Prince Mem*. at 25, where Defendants claim the State Department exercised "pervasive direction and control" over the Blackwater companies. This is simply not accurate according to former Blackwater employees, whose Declarations are appended and described below.

(explaining how Mr. Prince began to use the Greystone name to conduct business in Iraq after the Iraqi government prohibited "Blackwater" from operating in its country.)

These Complaints allege that Mr. Prince acted contrary to, and in violation of, United States government policies and instructions. Through their actions, Blackwater seriously harmed the United States and violated the law. *See, e.g., Abtan/617 Compl.* ¶ 60.

These Complaints allege that Mr. Prince fostered a culture of lawlessness, and encouraged employees to act in the company's financial interests at the expense of innocent human life. *See, e.g., Sa'adoon/615 Compl. ¶¶ 16, 18, 25-29; Albazzazz/616 Compl. ¶¶ 13, 14; Abtan/617 Compl. ¶¶ 2, 3, 49-57; Hassoon/618 Compl. ¶¶ 31-35, 46, 47, 80-85; Rabea/645 Compl. ¶¶ 1, 13-21.* Collectively, these Complaints describe with specificity multiple examples of Mr. Prince's men killing and wounding innocent Iraqis.

For example, the Hassoon/618 Complaint describes a killing as follows: "On July 1, 2007, a driver named Wala'a was driving a minibus for three related families who were going to Baghdad airport to apply for passports. The three families included parents with four children, including a three-month old baby; an uncle; and a cousin and his wife. As the families were returning from the airport, six Xe-Blackwater vehicles, including three with turrets, surrounded the minivan and opened fire for absolutely no reason. The Xe-Blackwater shooters killed the nine-year boy. The Xe-Blackwater shooters shot the mother in the back as she bent over, trying to protect the three-month old daughter from being shot. She was unsuccessful, as the baby was shot in the face. The Xe-Blackwater shooters hit the father and the uncle. They shot at, but missed, the two other children. The Xe-Blackwater shooters also hit the cousin, Sadiq Ahmed Ali. They shot at but missed his wife, Khalida Jasim Mohammed, and the driver. *Hassoon/618 Compl. ¶¶ 50-56.* The other Complaints are to like effect, spelling out in detail the dates and

- 3 -

times of the killings.  For example, the Abtan/617 Complaint describes the Nisur Square[3]

shootings:  "On September 16, 2007, heavily-armed Blackwater mercenaries (known in

Blackwater parlance as "shooters") working in Iraq began firing on a crowd of innocent civilians

without justification, resulting in multiple deaths and injuries."  *Abtan/617 Compl. ¶ 2.*  The acts

against each Plaintiff are detailed.  *See, e.g.*, *Abtan/617 Compl. ¶ 17*  (stating "Plaintiff Haider

Ahmed Rabe'a is a 32-year old Baghdad resident who was seriously injured by Xe-Blackwater

shooters when they shot him in both legs as he was trying to flee from his car to escape the

gunfire.")  *Abtan/617 Compl. ¶ 17*

## FACTS – DEPARTMENT OF JUSTICE INVESTIGATIONS

At present, the Department of Justice has convened at least three grand juries (in

Washington D.C., North Carolina and Washington) to hear evidence relating to the activities of

Mr. Prince and his employees.  According to a recent book published by an author receiving Mr.

Prince's cooperation, the Department of Justice has sent Mr. Prince's second-in-command, Gary

Jackson, a target letter.  *See* Suzanne Simons, "Master of War:  Blackwater's Erik Prince and the

Global Business of War" (Harper Collins, June 2009).  The relevant pages are attached as

Exhibit A.

The Department of Justice has indicted five of Mr. Prince's employees for their actions

on September 16, 2007 at Nisur Square, Iraq.   Indictment, District Court for the District of

Columbia, CR-08-360, December 4, 2008 (Urbina, J.)(attached as Exhibit B).  One of Mr.

Prince's employees, Jeremy P. Ridgeway, pled guilty to manslaughter, 18 U.S.C. §§ 3261(a)(1),

1112, and  attempt to commit manslaughter, 18 U.S.C. §§ 3261(a)(1), 1113. *See* Factual Proffer

---

[3] Plaintiffs initially used the "Nissoor" rather than "Nisur" spelling, but adopt here the latter
spelling, which has been used by the Department of Justice in the pending criminal proceedings.

in Support of Guilty Plea, Jeremy P. Ridgeway, November 18, 2008 (attached as Exhibit C); Information, District Court for the District of Columbia (Urbina, J.)(December 4, 2008)(attached as Exhibit D).

### FACTS – ADMISSIONS BY JEREMY RIDGEWAY

Mr. Ridgeway admitted that on September 16, 2007, he and his fellow employees "opened fire with automatic weapons and grenade launchers on unarmed civilians located in and around Nisur Square in central Baghdad, killing at least fourteen people, wounding at least twenty people, and assaulting but not injuring at least eighteen others." *Ridgeway Proffer ¶ 4.* Mr. Ridgeway admitted that he and his fellow employees fired multiple rounds of weapons from assault rifles and launched an M-203 grenade without any justification at civilians and civilian vehicles.  S*ee  Ridgeway Proffer ¶ 8-15* (detailing the firing); *Indictment* ¶ 9.

Mr. Ridgway admitted that he attempted to kill Plaintiff Al-Qalamchi. "At the time he fired those rounds into the white Chevrolet Celebrity [driven by Mr. Al-Qalamchi], defendant Ridgeway intended to kill the driver of that vehicle." *Ridgeway Proffer ¶ 12-13, 15*.

 Mr. Ridgeway admitted that Plaintiff Al-Qalamchi and the other innocent civilians at Nisur Square posed no threat to the convoy.  S*ee  Ridgeway Proffer ¶ 8-15* (detailing the firing); *Indictment* ¶ 9.  Mr. Ridgeway admitted that he and his fellow employees began using deadly force within seconds after entering Nisur Square.  Mr. Ridgeway admitted that he and his fellow employees did not warn that innocent civilians driving around Nisur Square that they would be subjected to deadly force unless they immediately came to a complete stop.  *Ridgeway Proffer ¶ 8. See also Ridgeway Proffer ¶ 11*.  Mr. Ridgeway admitted that he and his fellow employees shot those attempting to flee, and shot one victim in the chest who "was standing in the street with his hands up." *Ridgeway Proffer ¶ 4*.  Mr. Ridgeway admitted that he and his fellow

employees knew that the victims were civilians who posed no danger to the convoy.  *Ridgeway Proffer ¶ 4*.  Mr. Ridgeway admitted he and his fellow employees damaged at least eighteen cars with gunfire. *Ridgeway Proffer ¶ 4*; *Ridgeway Proffer ¶ 1*.  *See also* Indictment *¶ 1*.

Mr. Ridgeway admitted that he and his fellow employees knew that offensive use of firearms was in violation of State Department use-of-force policy, with which they had previously agreed to comply with in writing.  *Ridgeway Proffer ¶¶ 5-6*.  Mr. Ridgeway admitted that he and his fellow employees violated the Mission Firearms Policy by not providing any reasonable warnings to the civilians at Nisur Square before using deadly force.  *Ridgeway Proffer ¶ 11*.  Mr. Ridgeway also admitted that the State Department had ordered him and his fellow employees not to travel to Nisur Square, but to return to the Green Zone:  "[T]he Raven 23 convoy had been specifically ordered by the Regional Security Office of the United States Embassy to return to the International Zone as soon as possible.  In contravention of that order, the Raven 23 convoy, under the command of its shift leader, proceeded to set up a blockade at Nisur Square to stop civilian traffic from flowing through the traffic circle." *Ridgeway Proffer ¶ 7*.

### FACTS – STATEMENTS BY THE INTERNAL REVENUE SERVICE

On March 30, 2007, the Internal Revenue Service ("IRS") sent a letter addressed to Blackwater Security Consulting LLC, a company wholly owned and controlled by Erik Prince. This letter is attached as Exhibit E.  The IRS held that the men employed by Blackwater Security Consulting LLC could not be considered "independent contractors" – or "ICs" as Defendants continue to call them.  The IRS stated "your statement that the worker was an independent contractor pursuant to a written agreement is without merit.  For Federal employment tax purposes, it is the actual working relationship that is controlling and not the terms of the contract

(oral or written) between the parties." *See Exhibit E, 2.* The IRS also noted that its ruling "may be applicable to any other individuals engaged by the firm under similar circumstances." *Id*. at 5.

### *FACTS – STATEMENTS BY CONGRESSIONAL OVERSIGHT COMMITTEE*

The Chair of the Congressional House of Representatives Committee on Oversight and Government Reform sent Mr. Prince a letter dated October 22, 2007 ("Congressional Letter). This letter is attached as Exhibit F. The Chair began the letter by explaining he had "received documents which suggest that Blackwater may have engaged in significant tax evasion. *Congressional Letter, 1.* The Chair explained that there was "evidence that Blackwater has tried to conceal the IRS ruling [attached to this Opposition as Exhibit E] and the evasion of taxes from Congress and law enforcement officials." *Id. at 2.*

Blackwater paid the employee who had received the IRS ruling his back pay and other compensation in exchange for a promise from that the employee that he would not disclose the IRS ruling to any politician or public official. Blackwater had included the following in the agreement with the employee: **THE UTMOST PROTECTION AND NONDISCLOSURE OF CONFIDENTIAL INFORMATION IS OF CRITICAL IMPORTANCE AND IS THE ESSENCE OF THIS AGREEMENT**. (Capitalization and emphasis in the original.) The agreement was signed by Andrew Howell, who then served as General Counsel to Blackwater. The timing of the payment to the employee is suspect. Blackwater had the employee sign the non-disclosure agreement at the same time that Blackwater was resisting complying with a subpoena issued by the Congressional Committee. *Id.* at 11.

The Chair concluded "it now appears that Blackwater used this illegal schedule to avoid millions of dollars in taxes and then prevented the security guard who discovered the tax evasion

from contacting members of Congress or law enforcement officials." *Id.* at 2. The Chair estimated that Blackwater had defrauded the United States of at least $31 million in taxes during the period May 2006 and March 2007.

The Chair stated in sum: "[t]he IRS ruling that I have obtained indicated that Blackwater appears to have engaged in precisely this type of illegal scheme [described by the IRS in a consumer alert]. Compounding this egregious conduct, it also appears that Blackwater required the security guard who uncovered the tax evasion scheme to sign a nondisclosure agreement to keep members of Congress and other public officials in the dark. If this is accurate, Blackwater's conduct is inexcusable." *Id*. at 12.

### FACTS – DECLARATION BY JOHN DOE NO. 1

John Doe No. 1 is a former Marine who served this Nation until he was honorably discharged after being injured. He provided a Declaration executed under penalty of perjury that sets forth incidents he observed during his tenure with Blackwater. This Declaration is appended as Exhibit G. As he explains in the Declaration, he used a pseudonym rather than his real name to avoid violent retaliation: "I fear violence against me in retaliation for submitting this Declaration." *Decl. John Doe No. 1 ¶ 4.* [4]

John Doe No. 1 provides the following information: Blackwater was not abiding by the terms of the contract with the State Department. Instead, Blackwater was deceiving the State

---

[4] John Doe No. 1 and John Doe No. 2, former employees of Mr. Prince, submit their Declarations under pseudonyms. Both request anonymity because they fear violent retaliation from Mr. Prince for the reasons set out in their Declarations. *See Decl. John Doe No. 1 ¶* 4 and *Decl. John Doe No. 2 ¶* 3. Such anonymity for reasons of safety is well accepted in this Circuit. *See, e.g., James v. Jacobson*, 6 F.3d 233, 242 (4th Cir. 1993), in which the Court of Appeals adopted a framework for district courts in determining when to allow anonymity, including when identification poses a risk of "retaliatory physical or mental harm to the requesting party." *Id.*

Department. *Decl. John Doe No. 1 ¶ 3.* Blackwater continually breached its contractual obligations with the State Department by failing to report incidents of excessive, unjustified or illegal use of force to the Iraqi authorities and the State Department. *Decl. John Doe No. 1 ¶¶ 10-11, 20-21.* Blackwater permitted its employees to carry and use illegal weapons. *Decl. John Doe No. 1 ¶¶ 6, 14, 18, 22.*

Blackwater knew lethal force was being used unlawfully because a video was mounted on each vehicle. At the end of the day, Blackwater management watched the videotapes in what was known as a "hotwash" session. Rather than providing the State Department with the videos establishing excessive use of force, "the video was erased to prevent anyone other than Blackwater personnel seeing what had actually occurred." *Decl. John Doe No. 1 ¶ 23.*

Blackwater used persons who were not properly vetted and cleared by the State Department to serve as guards. In addition, Blackwater knew that certain of its personnel intentionally used excessive and unjustified deadly force, and in some instances used unauthorized weapons, to kill or seriously injure innocent Iraqi civilians. Blackwater did nothing to stop this misconduct. *Decl. John Doe No. 1 ¶ 6.*

Blackwater failed to discipline its employees who repeatedly used excessive force, instead allowing them to serve on the State Department contract. *Decl. John Doe No. 1 ¶¶ 6, 7, 12, 22.* For example, an employee named Beau Phillips shot innocent Iraqis on multiple occasions. Blackwater did not take any steps to discipline or stop him from doing so. Instead, Blackwater lied to State Department officials and portrayed the shootings as justified. *Decl. John Doe No. 1 ¶¶ 13-22.*

Another employee, Luke Doak (nicknamed "Peanut"), used excessive and unjustified force on more than one occasion and bragged and gloated about his "kills." Mr. Prince and the

others back in Moyock refused the request of Doak's on-the-ground supervisor, George Angerer, that Doak be placed on the "Do Not Use" list. *Decl. John Doe No. 1 ¶¶ 25-26.* For a description of another killing, see *Decl. John Doe No. 1 ¶¶ 8-12.*

John Doe No. 1 also recounts how Blackwater smuggled weapons into Iraq by hiding them in bags of dogfood. *Decl. John Doe No. 1 ¶ 5.*

An atmosphere of fear prevails within Mr. Prince's companies. John Doe No. 1 sought anonymity after learning from "Blackwater colleagues and former colleagues that one or more persons who have provided information, or who were planning to provide information about Erik Prince have been killed in suspicious circumstances." *Decl. John Doe No. 1 ¶ 4.*

## FACTS – DECLARATION BY JOHN DOE NO. 2

John Doe No. 2 is an American citizen who worked for Erik Prince for approximately four years. He has executed a Declaration under penalty of perjury. That Declaration is attached as Exhibit H (*Decl. John Doe No. 2*). John Doe No. 2 provided the same information set forth in his Declaration to the grand jury convened by the Department of Justice. *Decl. John Doe No. 2 ¶¶ 1, 2.* As with John Doe No. 1, he fears violent retaliation for submitting the Declaration, based both on past threats of violence against him as well as information Mr. Prince has caused the deaths of persons who intended to cooperate with the federal authorities. *Decl. John Doe No. 2 ¶ 3.*

John Doe No. 2 explains that Erik Prince personally created and controls all the various corporate entities named as Defendants in this lawsuit (collectively referred to as "Prince companies"). Mr. Prince and his employees operated all the various Prince companies as a single company without regard to any corporate formalities. All employees of all the companies worked for Mr. Prince, and his top manager, Gary Jackson, who together personally oversaw and

operated all of the Prince companies.  Mr. Prince created and operated this web of companies in

this manner to obscure wrongdoing, fraud and other crimes.  *Decl. John Doe No. 2 ¶¶ 4-6.*

John Doe No. 2 provides example of such operations, explaining that Mr. Prince

transferred funds from Blackwater to Greystone to avoid detection of his money laundering and

tax evasion schemes.  Mr. Prince failed to keep any accurate books or accountings by separate

entity, instead treating all the revenues flowing into the Prince companies as fungible and within

his complete and absolute personal control.  Mr. Prince contributed his personal wealth to fund

the operations of the Prince companies whenever he deemed such funding necessary.  Likewise,

Mr. Prince took funds out of the Prince companies and placed the funds in his personal accounts

at will.  *Decl. John Doe No. 2 ¶¶ 7-8.*

According to John Doe No. 2, Mr. Prince views himself as a Christian crusader tasked

with eliminating Muslims and the Islamic faith from the globe.  Mr. Prince intentionally

deployed to Iraq certain men who shared his vision of Christian supremacy, knowing and

wanting these men to take every available opportunity to murder Iraqis.  Mr. Prince operated his

companies in a manner that encouraged and rewarded the destruction of Iraqi life.  For example,

Mr. Prince's executives would openly speak about going over to Iraq to "lay Hajiis out on

cardboard."  Going to Iraq to shoot and kill Iraqis was viewed as a sport or game.  *Decl. John

Doe No. 2 ¶¶ 9-11.*

John Doe No. 2 reports also that Mr. Prince is motivated by greed.  Mr. Prince and his top

manager Gary Jackson knew the men being deployed were not suitable candidates for carrying

lethal weaponry, but did not care because deployments meant more money.  Mr. Prince ignored

the advice and pleas from certain employees, who sought to stop the unnecessary killing of

innocent Iraqis.  Certain employees located overseas refused to deploy unfit men and instead sent

them back to the United States, advising that they were unfit to deploy for various reasons. These reasons included the men (a) making statements about wanting to deploy to Iraq to "kill ragheads" or achieve "kills" or "body counts," (b) excessive drinking, (c) steroid use, and (d) failure to follow safety and other instructions regarding lethal weaponry.  When these demonstrably unfit men were returned to the United States, Mr. Prince and his executives would send them back to be deployed in Iraq with an express instruction to the concerned employees located overseas that they needed to "stop costing the company money."   Mr. Prince hid this misconduct from the State Department, failing to advise them of his employees' findings and the findings of mental health professionals.  *Decl. John Doe No. 2 ¶¶ 12-15.*

Mr. Prince obtained and provided illegal ammunition to his men.   Mr. Prince also made available to his employees in Iraq various weapons not authorized by the United States contracting authorities, such as hand grenades and hand grenade launchers.  Mr. Prince's employees repeatedly used this illegal weaponry in Iraq, unnecessarily killing innocent Iraqis. *Decl. John Doe No. 2 ¶¶ 16-17.*

Mr. Prince also generated substantial revenues from participating in the illegal arms trade.  Using his various companies, he procured and distributed various weapons, including unlawful weapons such as sawed off semi-automatic machine guns with silencers, through unlawful channels of distribution.  Mr. Prince and his employees arranged for the weapons to be polywrapped and smuggled into Iraq on Mr. Prince's private planes, which operated under the name Presidential Airlines.[5]   *Decl. John Doe No. 2 ¶¶ 21-22.*

---

[5] Mr. Prince's wholly-owned Presidential Airways unsuccessfully sought to avoid liability by invoking the political question doctrine.  *See McMahon v. Presidential Airways, Inc.,* 502 F.3d 1331 (11th Cir. 2007), discussed below at page 54.

Mr. Prince hid the revenue from his illegal weapons trade with assistance from an employee named Carol Confers.  *Decl. John Doe No. 2 ¶ 22.*  Mr. Prince and his top managers gave orders to destroy emails and other documents.  Many incriminating videotapes, documents and emails have been shredded and destroyed.  *Decl. John Doe No. 2 ¶ 23.*

## FACTS – IRAQI LAW

Plaintiffs obtained expert opinions about the content of Iraqi law from several prominent jurists and practitioners.  The Declaration of Dr. Saleem Abdullah Al Juboori, a current member of the Iraqi Parliament and Chair of its Legal Committee, is attached as Exhibit J.  The Declaration of Dr. Aziz Jawad Hadi, Professor of Civil Law, Head of the Department of Private Law, Baghdad University, is attached as Exhibit K.  The Declaration of Dr. Fadhil Doulan, a former Judge and private attorney practicing in Iraq, is attached as Exhibit L.  In addition, for the Court's convenience, Plaintiffs had the actual text of the relevant sections of the Iraqi Civil Code translated in full.  These sections are appended as Exhibits M.

## ARGUMENT

Plaintiffs respectfully request that this Court deny Defendants' Motions To Dismiss.  As explained below in Section I, Plaintiffs properly bring claims against Mr. Prince and the various companies named as Defendants (hereinafter "Blackwater companies.")  *See Opposition* at 14-18.

Section II explains that Plaintiffs have standing and properly complied with the pleading intricacies of the Racketeer Influenced and Corrupt Organizations Act ("RICO") by pleading that Mr. Prince personally committed a series of related predicate acts in the United States. *See Opposition* at 18-33.

- 13 -

Section III explains this Court has the power and obligation to hear Plaintiffs' claims under the Alien Tort Statute ("ATS"), 28 U.S.C. § 1350 and 28 U.S.C. § 1331.  These claims are federal common law tort claims based international law and *inter alia* the federal War Crimes Act statute, 18 U.S.C. § 2441.  *See Opposition* at 33-41.

Section IV responds to Mr. Prince's argument about the lack of secondary liability by pointing out that Plaintiffs allege Mr. Prince has direct liability for his own acts, as well as liability for the acts of his employees.  *See Opposition* at 41-45.

Section V establishes that punitive damages are available for federal common law claims alleging war crimes and summary execution.  *See Opposition* at 45-46.

Section VI explains why Supreme Court jurisprudence and the Fourth Circuit's decisional law prevent Mr. Prince from invoking the political question doctrine.  *See Opposition* at 47-57.

Section VII also explains that Mr. Prince's attempt to invoke the government contractor defense is premature, as that defense is a fact-based affirmative defense applied by a jury.  *See Opposition* at 57-59.

Section VIII rebuts Mr. Prince's attempt to immunize his hiring and supervisory practices from any judicial scrutiny by claiming absolute immunity.  *See Opposition* at 59-61.

Finally, Section IX explains why it is premature for this Court to rule on the choice-of-law issues raised by Plaintiffs' claims.  *See Opposition* at 61-71.

## I.    *MR. PRINCE AND THE COMPANIES ACTING AS HIS ALTER EGO SHOULD NOT BE DISMISSED.*

These lawsuits do not allege a breach of contract; they allege Defendant Prince and his web of companies intentionally shot and killed innocent Iraqis.  Defendant Prince seeks to evade

personal responsibility and legal liability for his misconduct, and asks this Court to dismiss him and all the various corporate entities except the one company (Blackwater) that entered into a contract with the Department of State. *Prince Mem.* at 30. This Court should deny that request.

Plaintiffs are entitled to proceed against Erik Prince, the exclusive owner of an intricate web of wholly-owned and privately-held companies. In this jurisdiction, the Court must conduct a "fact-specific inquiry into the circumstances surrounding the corporation, the related parties, and the acts in question" before deciding whether to pierce the corporate veil. *C.F. Trust, Inc. v. First Flight Ltd. Partnership,* 111 F. Supp. 2d 734, 742 (E.D. Va. 2000) (applying Virginia law). There is "no single rule or criterion [that] ... can be applied to determine whether piercing the corporate veil is justified." *O'Hazza v. Exec. Credit Corp.,* 431 S.E.3d 318, 320 (Va. 1993). Rather, as explained by the Supreme Court of Virginia, "[e]ach case must be considered in the context of its own specific circumstances." *Dana v. 313 Freemason,* 266 Va. 491, 500 (Va. 2003).

Here, the facts alleged in the Complaints suffice to pierce the many corporate veils. Plaintiffs adequately allege, and will prove at trial, that Mr. Prince created this web of companies in order to obscure the extent of his criminality. The Complaints allege Defendant Prince is the exclusive owner of all the corporate entities. *Abtan/617 Compl. ¶ 33, Albazzaz/616 Compl. ¶ 12; Hassoon/618 Compl. ¶¶ 23, 33; Rabea/645 Compl. ¶ 7; Sa'adoon/615 Compl.¶ 7.* Erik Prince personally created and controls the various corporate entities named as Defendants in these lawsuits. *Decl. John Doe No. 2 ¶ 4.* The purpose of creating and running this "web of companies" was to "obscure wrongdoing, fraud and other crimes." *Decl. John Doe No. 2 ¶ 6.* The "Prince companies all operated as a single company" and none of the employees, including

- 15 -

Erik Prince, "observe[d] any corporate formalities or otherwise operate any of the Prince companies as independent entities." *Decl. John Doe No. 2 ¶ 4.*

Defendant Prince exercised complete and utter control over all the various companies. *Abtan/617 Compl. ¶¶ 33, 38*; *Albazzaz/616 Compl. ¶¶ 9, 12*; *Hassoon/618 Compl. ¶¶ 23, 27, 33*; *Rabea/645 Compl. ¶ 10*; *Sa'adoon/615 Compl. ¶ 10.* Defendant Prince and his subordinates did not observe the corporate formalities required to have the various companies recognized as stand-alone legal entities. *Abtan/617 Compl. ¶¶ 33, 38*; *Albazzaz/616 Compl. ¶¶ 9, 12*; *Hassoon/618 Compl. ¶¶ 27, 33, 129*; *Rabea/645 Compl. ¶ 10*; *Sa'doon/615 Compl. ¶ 10.* Instead, as explained by a former subordinate, Defendant Prince and his subordinates operated all the various entities as if they were a single company. *Decl. John Doe No. 2 ¶ 4.*

Defendant Prince formed all these various entities merely to evade the laws governing his conduct. *Abtan/617 Compl. ¶ 38*; *Albazzaz/616 Compl. ¶ 9; Hassoon/618 Compl. ¶ 27.* Defendant Prince created and operated this web of companies in order to obscure wrongdoing, fraud and other crimes.   As explained in both the Declaration of John Doe No. 2 and Suzanne Simon's book, *Master of War*, Defendant Prince transferred funds and personnel from one company to another as needed.  John Doe No. 2 explains these transfers were done "whenever necessary to avoid detection of his money laundering and tax evasion schemes." *Decl. John Doe No. 2 ¶ 7.*

Further, Defendant Prince and his companies failed to keep any accurate books or accountings by separate entity, but instead "Mr. Prince treated all the revenues flowing into the Prince companies as fungible and within his complete and absolute personal control." *Decl. John Doe No. 2 ¶ 8; Rabea/645 Compl. ¶ 21,* alleging that Xe-Blackwater, in an attempt to obscure its illegal operation in Iraq, directed its employees to enter into new contracts under the

Greystone name (another corporate incarnation of Mr. Prince and Xe-Blackwater) rather than the Blackwater name.

The Supreme Court of Virginia held that corporate veils ***must*** be pierced when (1) the "unity of interest and ownership is such that the separate personalities of the corporation and the individual no longer exist and to adhere to that separateness would work an injustice," and (2) the corporate owner has "used the corporation to evade a personal obligation, to perpetrate fraud or a crime, to commit an injustice, or to gain an unfair advantage ...." *O'Hazza v. Exec. Credit Corp.,* 431 S.E.3d 318, 320-1 (Va. 1993).

Plaintiffs have alleged facts (and begun to demonstrate with evidence) the existence of these two elements, which, if proven at trial, would ***require*** the jury to pierce the corporate veils and hold Defendant Prince personally responsible for the wrongdoing of his web of companies. On the first element, the corporate entity was the "alter ego, alias, stooge, or dummy of [Defendant Prince] the individuals sought to be charged personally." *Cheatle v. Rudd's Swimming Pool Supply Co., Inc.,* 360 S.E.2d 828, 831 (Va. 1987). The Complaints allege Defendant Prince alone was the person in charge and able to make major operational decisions, and used the companies merely as tools to implement his own decisions. *Abtan/617 Compl. ¶ 33*; *Albazzaz/616 Compl. ¶¶ 6, 9, 12*; *Hassoon/618 Compl. ¶ 23*; *Rabea/645 Compl. ¶ 10; Sa'adoon/615 Compl. ¶ 10.* Although Defendant Prince relied on a key subordinate, Gary Jackson, only Erik Prince had complete personal control over the various corporate defendants named in this case.

On the second element, whether the individual defendant has attempted to use his control over the corporate entities to evade a personal obligation or perpetuate a fraud, the Complaints are crystal clear. The Complaints allege Defendant Prince created the various companies merely

to reduce his legal exposures, and used the companies to avoid detection of his wrongdoing. *Abtan/617 Compl.* ¶ *33*; *Albazzaz/616 Compl.* ¶¶ *9, 12*; *Hassoon/618 Compl.* ¶ *27*; *Rabea/645 Compl.* ¶ *10; Sa'adoon/615 Compl.* ¶ *10.*

In sum, this Court should reject Defendants' invitation to commit reversible error by dismissing Defendant Prince and the corporate entities other than Blackwater. There is no reason to take such a drastic step at this early procedural juncture. Rather, this Court should permit Plaintiffs to proceed to build the record on Defendant Prince's complete and utter control over all the companies. Defendant Prince is the mastermind and sole beneficiary of the ongoing racketeering schemes, and should not be permitted to evade liability merely by hiding behind wholly-owned and fully-controlled corporate shells that have no independent existence.[6]

## II. PLAINTIFFS STATE VALID FEDERAL RACKETEERING CLAIMS AGAINST ERIK PRINCE.

Plaintiffs in two of the lawsuits amended their Complaints to add claims under the Racketeer Influenced and Corrupt Organizations Act ("RICO"). Mr. Prince accuses Plaintiffs' counsel of adding these claims merely to inflame the prejudice and passions of the jury. *Prince Mem.* at 13.[7] Further, despite the pendency of grand jury investigations in three jurisdictions

---

[6]Defendants claim one company, Greystone, is a foreign entity incorporated in Barbados. Although Defendants did not attach any certificate of incorporation, Plaintiffs have obtained the certificate, which is attached as Exhibit I. As is evidenced by the Exhibit, Greystone's "board" steadily consists of Defendant Erik Prince, who is joined by a revolving cast of subordinates serving as the second "board" member. The company's guarantor is Prince's bank in Michigan, Huntington Bank. These documents support Plaintiffs' allegation that Greystone is simply one of the many alter egos of Defendant Prince. Greystone does not have offices in Barbados. Greystone does not do business in Barbados. Rather, Greystone is simply used as an offshore conduit for funds. If at this time, the Court decides to credit Greystone as a real foreign company that suffices to destroy diversity, Plaintiffs stand ready to dismiss Greystone.

[7] Defendant Prince reasons that the RICO claims seek *de minimis* amounts in terms of damages, and therefore should be considered as spurious claims brought for improper purposes. As a matter of law in this Circuit, the amount of damages sought does not impact the viability of

(*see Statement of Facts*), Defendant Prince seeks dismissal of the RICO claims on the grounds

that they allege facts that are not "plausible" under the newly-developed standard announced by

the Supreme Court in *Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009).

Both the accusation and the argument lack merit, and contradict the Supreme Court's

teachings in *Sedima v. Imrex Co*., 473 U.S. 479 (1985)(RICO is to be read broadly, and should

be liberally construed to effectuate its remedial purpose in granting the private right of action).

Although the RICO charges against Defendant Prince are indeed sensational, that fact results

from the breadth and scope of criminal misconduct engaged in by Defendant Prince and his

subordinates.  As set forth more fully in the Statement of Allegations and Facts, the evidence

supports Plaintiffs' RICO claims.  Defendant Erik Prince operates a criminal enterprise designed

to augment his substantial personal wealth and advance his views of Christian supremacy.  Many

innocents have lost their lives as a result of Defendant Prince.  *See, e.g., Abtan/617 Compl. ¶ 45,*

*Albazzaz/616 Compl. ¶ 13.* Many laws have been broken by Defendant Prince.  *See* Exhibits A –

H.  *See also Decl. John Doe No. 2 ¶ 6.* In short, the Complaints' RICO allegations simply cannot

be dismissed as implausible under the Supreme Court's reasoning in *Ashcroft v. Iqbal*, 129 S. Ct.

1937 (2009).

In addition to claiming "implausibility" and impugning opposing counsel's motives for

adding the RICO claims, Defendant Prince argues that four factors doom Plaintiffs' claims:

Plaintiffs (1) failed to plead Erik Prince perpetrated the predicate acts (*Prince Mem.* at 14-16*);*

(2) failed to plead a pattern (*id.* at 19-20*); (3)* lack standing (*id.* at 16-18*);* and (4) are seeking

extraterritorial application of RICO (*id.* at 18-19*).*   Subsection A addresses the first and second

RICO claims.  *See, e.g. Potomac Electric Power Company v. Electric Motor and Supply*
*Incorporated*, 262 F.3d 260, 266 (4th Cir. 2001) (nominal damages suffices to establish RICO
injury).

factors, and explains that Plaintiffs' allegations suffice to satisfy the intricacies of RICO pleading because they allege Defendant Prince perpetrated multiple and related RICO predicate acts. Subsection B explains that the RICO Plaintiffs have standing because their properties were damaged during the commission of murders, a predicate act. Subsection C explains that the RICO Plaintiffs are not seeking extraterritorial application of RICO, but rather are seeking to penalize Defendant Prince's conduct that occurred in Virginia and North Carolina and had substantial effects throughout the United States.

### A. *Plaintiffs Alleged Erik Prince Perpetrated a Pattern of Related Acts of Racketeering.*

Defendant Erik Prince seeks but cannot find shelter in the decisional law on RICO. The federal judiciary tends to reject litigants' efforts to transform commercial and trivial disputes into civil RICO actions, which has led to a substantial body of caselaw on what does *not* rise to the level of a RICO claim. *See, e.g.*, *Palmetto State Medical Center Inc. v. Operation Lifeline, et. al.*, 117 F.3d 142 (4th Cir. 1997); *Bast v. Cohen, Dunn & Sinclair PC*, 59 F.3d 492 (4th Cir. 1995). But undersigned counsel could not find any action in which a court dismissed a RICO complaint for failure to plead predicate acts when the complaint alleged repeated murders. Rather, in those instances when confronted with a lawsuit against a criminal kingpin who sits atop criminal enterprises and directs others to engage in the dirty work, the federal judiciary has not hesitated to proceed under RICO. *See, e.g.*, *United States v. Licavoli*, 725 F.2d 1040 (6th Cir. 1984) (upholding the conviction of mafia kingpin and five of his associates); *United States v. Pungitore*, 910 F.2d 1084, 1134 (3d Cir. 1990) (prosecuting a mafia boss under RICO; finding murder and conspiracy to commit murder to be a valid predicate act under RICO). *See generally EPlus Technology, Inc. v. Aboud*, 313 F.3d 166 (4th Cir. 2002) (upholding a RICO judgment

- 20 -

based on fraudulent schemes and permitting as substantiating evidence adverse inferences drawn

from Defendants' invocation of the Fifth Amendment).

Note, however, that even if credited by this Court, Defendant Prince's pleading

arguments would not merit dismissal, as any RICO pleading deficiencies may be corrected by

amendment.  *See, e.g. Chisholm v. Transouth Financial Corporation*, 95 F.3d 331 (4th Cir.

1996) (trial court abused its discretion when it failed to permit RICO claimants to amend their

complaint).

### 1.   *Plaintiffs allege Defendant Erik Prince perpetrated multiple predicate acts of murder.*

Defendant Prince argues that the RICO claims should be dismissed because Plaintiffs fail

to allege that he (Prince) perpetrated any of the predicate acts.  Defendant Prince cites *Palmetto

State Medical Center, Inc. v. Operation Lifeline et al.*, 117 F.3d 142 (4th Cir. 1997) for the

proposition that Plaintiffs cannot use the phrase "Prince RICO Enterprise" to convey facts about

Mr. Prince himself.[8]  In *Palmetto State*, the Court of Appeals for the Fourth Circuit reversed a

jury verdict reached after trial, finding the evidence did not support a finding that Defendants

committed any predicate acts.  *Palmetto State* thus speaks to the quantum of evidence needed to

prevail on RICO claims at trial, and does not actually address the type of allegations that suffice

to survive a motion to dismiss.   Mr. Prince cites only a district court decision from another

Circuit to support his argument that he must have "personally committed" the predicate act to be

held liable under RICO. *Prince Mem.* at 15. RICO does not require that an individual "personally

committed" a predicate act.   *See* 18 U.S.C. § 1962 (a)-(d).

---

[8] Although counsel are confident that their form of drafting satisfies the RICO pleading standard
and places Mr. Prince on notice that he is alleged to have perpetrated the predicate acts, Plaintiffs
stand ready to amend their Complaints if so ordered by the Court to substitute the words "Erik
Prince."

Here, the RICO Complaints clearly put Defendant Prince on notice that he is alleged to have perpetrated the listed predicate acts, including the murders, tax evasion, and weapons smuggling. Stated differently, Mr. Prince is equivalent to a top mafia boss who is responsible for all the day-to-day crimes committed at his direction and behest. *See, e.g., United States v. Licavoli*, 725 F.2d 1040 (RICO used to convict Cleveland mob boss, James T. Licavoli). The RICO Complaints allege Erik Prince created the Prince RICO Enterprise, a separate entity, to carry out his criminal wishes. *Abtan/617 Compl. ¶ 117; Hassoon/618 Compl. ¶ 129*. The RICO Complaints allege Erik Prince is the sole person in complete and absolute control over the Enterprise, and is the beneficiary of the Enterprise's criminal misconduct. *Abtan/617 Compl. ¶ 119; Hassoon/618 Compl. ¶ 131*.

These allegations satisfy this Circuit's RICO pleading requirements. *See, e.g., New Beckley Mining Corporation v. International Union*, 18 F.3rd 1161 (4th Cir. 1994). As the Court of Appeals for the Fourth Circuit taught in the seminal case on RICO pleading, *Busby v. Crown Supply, Inc*., 896 F.2d 833 (4th Cir. 1990), plaintiffs properly state a RICO claim by alleging that the operation of the RICO enterprise harmed them.

Here, the predicate acts perpetrated by RICO Defendant Prince include multiple murders. As testified to under penalty of perjury by John Doe No. 2, Mr. Prince views himself as a Christian crusader tasked with eliminating Muslims and the Islamic faith from the globe. *Decl. John Doe No. 2 ¶ 9*. Mr. Prince intentionally deployed to Iraq certain men who shared his vision of Christian supremacy, and encouraged them to kill Iraqis. *Decl. John Doe No. 2 ¶¶ 10-11*. In addition to his Christian supremacist views, Mr. Prince was also motivated by greed. He knowingly deployed unsuitable candidates for carrying lethal weaponry because deployments meant more money. *Decl. John Doe No. 2 ¶ 12*. Mr. Prince ignored the advice and pleas from

- 22 -

certain employees, who sought to stop the deployments and resulting killings of innocent Iraqis. *Decl. John Doe No. 2* ¶ 13.  *See also Decl. John Doe No. 1* which describes additional deaths; and Exhibit C, in which one of Mr. Prince's men admits to killing innocent Iraqis.  These murders suffice as predicate acts perpetrated by Mr. Prince.

Such conduct by Mr. Prince constitutes murder chargeable under federal law, 18 U.S.C. § 1111(a).  Mr. Prince showed "malice aforethought" in terms of killing the Iraqis.  That malice aforethought elevates his misconduct to murder.  He knowingly armed (often with illegal weaponry and ammunition) men who had openly expressed intent to kill Iraqis, or who were under the influence of judgment-altering drugs.  He then sent those men into Iraq safe in the knowledge that they would be free from discipline or termination if they killed Iraqis for no reason.  Such conduct is actionable as murder in this Circuit.

As the Court of Appeals explained, "[m]alice may be established by evidence of conduct which is 'reckless and wanton and a gross deviation from a reasonable standard of care, of such a nature that a jury is warranted in inferring that defendant was aware of a serious risk of death or serious bodily harm.'" *United States v. Fleming*, 739 F.2d 945, 947-48 (4th Cir. 1984) (citations omitted).  *See also United States v. Williams,* 342 F.3d 350, 356 (4th Cir. 2003) (finding the defendant guilty of murder despite someone else pulling the trigger because defendant acted with malice when he actively participated in a robbery and he was well aware of the risk of death or serious bodily harm to the victim). Whether malice is present in a given case "must be inferred by the jury from the whole facts and circumstances surrounding the killing." *Fleming*, 739 F.2d at 947.  In *Fleming*, the defendant drove drunk at excessive speeds and at certain points crossed-over the median and drove against the flow of traffic at excessive speeds.  The defendant lost control of his vehicle, resulting in the death of another driver when his car struck hers, in the

- 23 -

opposite lane, at a speed nearly twice that of the speed limit. The Court of Appeals for the Fourth Circuit upheld the district court's conviction for murder, finding that such conduct constituted wanton and reckless disregard for human life. *Fleming*, 739 F. 2d at 948-949.

Defendant Prince, seeking to elevate form over substance, argues that this Court should not view these murders as predicate acts because they occurred in Iraq, and therefore are not considered "chargeable under state law" for purposes of the RICO analysis. This argument is wrong as matter of law for two reasons. First, RICO's reference to "chargeable under state law" merely describes the type of general conduct which will serve as a RICO predicate and satisfy RICO's pattern requirement. As explained by the Court in *United States v. Le*, 316 F.Supp.2d 355, 360 (E.D. Va. 2004), "[r]ather, it seems clear that Congress, not wishing to unnecessarily create new crimes, sought to craft 1959 so that it reached the generic conduct described therein, whatever label a particular state might use to criminalize that conduct. In other words, it is clear that Congress intended to include within the scope of 1959, generic conduct amounting to an assault with a dangerous weapon, in violation of state law regardless of what label a state may attach to that conduct." *See also United States v. Coonan*, 938 F.2d 1553 (2d Cir. 1991); *accord United States v. Carrillo*, 229 F.3d 177, 182 (2d Cir. 2000).

Second, Mr. Prince's conduct is chargeable as murder under federal law in this Circuit and under Virginia and North Carolina law. In Virginia, prosecutors are permitted to charge murder when they find an unlawful killing resulted from malice, which is defined as "any purposeful, cruel act is committed by one individual against another without any, or without great provocation." *Craig v. Commonwealth*, 538 S.E.2d at 360 (*quoting Pugh v. Commonwealth*, 292 S.E.2d 339, 341 (Va. 1982). Of course, "[w]hether a defendant acted with malice is generally a question to be decided by the trier of fact," *Craig*, 538 S.E.2d at 360

- 24 -

(citations omitted), and as such, cannot be decided on a motion to dismiss. As explained in *Porter v. Commonwealth*, 435 S.E.2d 148, 150 (Va. App. 1993) (*quoting Essex v. Commonwealth*, 322 S.E.2d 216, 220 (Va. 1984)), "In the absence of express malice, [malice] may only be implied from conduct likely to cause death or great bodily harm, willfully or purposefully undertaken. Thus, for example, one who deliberately drives a car into a crowd of people at a high speed, not intending to kill or injure any particular person, but rather seeking the perverse thrill of terrifying them and causing them to scatter, might be convicted of second-degree murder if death results." *See also Aldridge v. Commonwealth*, 606 S.E.2d 539, 559 (Va. App. 2004) (quoting *Moxley v. Commonwealth,* 77 S.E.2d 389, 393 (Va. 1953)); *Essex v. Commonwealth*, 322 S.E.2d 216, 220 (Va. 1984); *Pierce v. Commonwealth*, 115 S.E. 686, 692 (Va. 1923) (upholding a murder conviction for a fatal booby trap that killed a police officer, as the court "implies malice from the wanton and reckless disregard of the safety of others"). *See also Pugh*, 292 S.E.2d at 341 (Va. 1982) (upholding murder conviction for a three-year-old's death after significant abuse; though "malice as such does not exist, the law regards the circumstances of the act as so harmful that the law punishes the act as though malice [does] in fact exist") (quoting 1 *Wharton's Criminal Law and Procedure* § 245 at 529 (1957)). There is no requirement that Mr. Prince himself pulled the trigger to be held liable for murder. *See, e.g., Williams v. Commonwealth,* 2003 Va. App. LEXIS 206 at *6 (Va. App. Apr. 8, 2003) (upholding conviction as a principal for murder in the second degree based on defendant having been "present, aiding and abetting [Martin in the commission of the crime]" and having "intended his ... words, gestures, signals, or actions to in some way encourage, advise, urge, or in some way help [Martin] committing the crime to commit it.") (citations omitted). In short, a Virginia

prosecutor could charge Erik Prince with murder based on the facts alleged in the RICO Complaints.

In North Carolina, a prosecutor may charge murder based on such recklessness as to evince "depraved heart" malice. *State v. Mapp*, 264 S.E.2d 348, 355 (N.C. App. 1980). Under North Carolina law, malice may include killing without just cause, excuse, or justification. *State v. Hamilton,* 335 S.E.2d 506, 509 (N.C. App. Ct. 1985). Malice may also be found in an act that evinces "hardness of heart, cruelty, recklessness of consequences, and a mind regardless of social duty and deliberately bent on mischief." *State v. Wilkerson,* 247 S.E.2d 905, 916 (N.C. 1978); *accord State v. Miller*, 543 S.E.2d 201, 206 (N.C. 2001) ("Another kind of malice arises when an act which is inherently dangerous to human life is done so recklessly and wantonly as to manifest a mind utterly without regard for human life and social duty and deliberately bent on mischief…"). *See also Wilkerson*, 247 S.E.3d at 918 ("An act that indicates a total disregard for human life is sufficient to supply the malice necessary to support the crime of second degree murder.") Malice may be express or implied by the acts of the defendant and circumstances of the killing. *State v. Faust*, 118 S.E.2d 769, 772 (N.C. 1961) (defendant's threatening to kill victim was evidence of express malice); *Mapp*, 264 S.E.2d at 353 (the extent and severity of child victim's physical abuse were sufficient for implied malice). Malice may also be shown by evidence of hatred, ill will, or dislike toward the victim. *State v. Duboise*, 181 S.E.2d 393 (S.C. 1971) (malice established by evidence that defendant was cursing and assaulting victim for hours before death). Unlawful killings committed with deadly weapons are presumed to have been done with malice. *State v. Lang*, 308 S.E.2d 317 (N.C. 1983); *State v. Robbins*, 309 S.E.2d 188 (N.C. 1983). In short, a North Carolina prosecutor could charge Erik Prince with murder on the facts alleged here.

## 2. *Plaintiffs allege Erik Prince established an enterprise that engaged in a pattern of related racketeering acts*.

Defendant Prince also argues that Plaintiffs failed to allege facts sufficient to satisfy two other RICO requirements:  (1) establishing an Enterprise that (2) engaged in a related pattern of criminal acts.  *Prince Mem.* at 8-9.

### (a) Establishing an enterprise

As legal support for the argument that Plaintiffs failed to plead properly, Defendants cite only an Eleventh Circuit case, *Raney v. Allstate Insurance Co*., 370 F.3d 1086 (11th Cir. 2004) and a North Carolina district case, *Joyner v. Abbott Laboratories*, 674 F. Supp. 185 (E.D. N.C. 1987).  In those actions, the factual averments made by Plaintiffs did not suffice to state civil RICO claims.  In *Raney*, an anti-abortion activist (Raney) sued his insurance company and abortion clinics, alleging they violated RICO by threatening to sue him. *Raney*, 370 F.3d at 1087. The Court held that Raney could not transform a state-law malicious prosecution claim into a federal crime.  *Id.* at 1088. In *Joyner*, the District Court refused to permit a Plaintiff proceeding *pro se* to amend the complaint to allege that Defendants violated the Social Security Act, ERISA and RICO. *Joyner*, 674 F. Supp. at 190-91.  The Court refused to allow the amendment because the "allegations are completely conclusory and give no hint as to how the alleged actions violate" the laws. *Id.* at 190. The Court relied on Rule 8 of the Federal Rules of Civil Procedure to deny the motion to amend.  Importantly, however, the Court denied the Defendants' motion to dismiss and for summary judgment, finding that there were not sufficient facts on the record to rule whether or not the claims should be dismissed. *Id.* at 192.

Here, the controlling caselaw on establishing an enterprise is not from the Eleventh Circuit, but from the Fourth Circuit.  In *New Beckley Mining Corp. v. International Union,*

*United Mine Workers*, 18 F.3d 1161, 1163 (4th Cir. 1994), the Court found that there had to be a distinction between the "person" and the "enterprise." There is no such complexity as found in *New Beckley* because there is a natural "person" Mr. Prince, who created a distinct "enterprise" to engage in his criminal conduct. The "enterprise" that Plaintiffs have described as the "Prince RICO Enterprise" includes Blackwater and the other companies named as Defendants. This structure is the classic RICO structure, as it mimics that found in organized crime families where a human kingpin sits atop an empire of corporate constructs designed to evade wrongdoing.

### (b) Pleading a pattern

As to the alleged lack of pattern, Defendant Prince cites *Palmetto State Medical Center v. Operation Lifeline*, 117 F.3d 142 (4th Cir. 1997).[9] That case arose from a series of anti-abortion protests. Although plaintiffs prevailed on RICO at trial, the Court of Appeals reversed the jury verdict because the record evidence simply did not support the verdict. The Court noted that plaintiffs "simply offered no proof" that the remaining defendants conducted Operation Rescue's affairs on the dates in question. *Palmetto*, 117 F.3d at 149.

It is hard to understand why Defendant Prince views this Fourth Circuit case as controlling on the facts here. Defendant Prince appears to be willfully missing the mark by ignoring the facts alleged by Plaintiffs. Plaintiffs respectfully submit that they have alleged the necessary facts, as described by the controlling RICO jurisprudence developed by the Supreme Court and the Court of Appeals for the Fourth Circuit.

That jurisprudence requires that the acts have similar purposes and victims. *See H.J. Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. 229 (1989); *Menasco, Inc. v. Wasserman*, 886

---

[9] Mr. Prince also cites a Second Circuit case, *De Falco v. Bernas*, 244 F.3d 286 (2d Cir. 2001), which was also an appellate reversal after a jury trial.

F.2d 681 (4th Cir. 1989).   Isolated acts impacting a small number of victims likely do not suffice

under RICO.  *See International Data Bank v. Zepkin*, 812 F.2d 149, 145 (4th Cir. 1987) ("[w]hat

constitutes a RICO pattern is thus a matter of criminal dimension and degree").

The pattern of acts must be continuous.  *Anderson v. Foundation for the Advancement,*

*Education and Employment of American Indians*, 155 F.3d 500 (4th Cir. 1998); *Brandenburg v.*

*Seidel*, 859 F.2d 1179 (4th Cir. 1988) (pattern is considered continuous unless it has a limited

goal whose accomplishment would bring the criminal enterprise to an end).

Here, Plaintiffs have alleged that, beginning in at least 2003, Defendant Prince engaged

in a series of related and continuous illegal acts.  *Hassoon/618 Compl.  ¶¶ 129, 131*; *Abtan/617*

*Compl. ¶¶ 117, 119*.   Defendant Prince engaged in a pattern of criminal conduct aimed at a

certain and large class of victims, Iraqis.  He was motivated by two factors:  greed and a desire

for Christian supremacy.  *Decl. John Doe No. 2 ¶¶ 9-10*.  Defendant Erik Prince and his

enterprise will continue its racketeering unless stopped by this Court.  *Hassoon/618 Compl. ¶*

*132*.

Defendant Erik Prince, acting through an enterprise under his control, killed innocent

Iraqis by unleashing his men with permission to kill at will.  Jeremy Ridgeway, one of Prince's

men, admitted that he and his colleagues ignored State Department directives to return to the

Green Zone, and instead rolled into Nisur Square and opened fire on innocent Iraqis.  They did

so without giving any warnings.  They shot and killed Iraqis fleeing for their lives, and Iraqis

with their hands in the air.  *See Statement of Facts* at 4-5.

The Nisur Square killings were by no means isolated events.  The same pattern prevailed

throughout Iraq.  A former American marine with first-hand information described certain of

these murders. *See Decl. John Doe No. 1 ¶¶ 8-22.* The Complaints allege many additional murders, all in the same pattern. *See Complaint Allegations* at 2-3.

In addition to murdering innocent Iraqis, Defendant Prince has furthered his twin goals of wealth and Christian supremacy by participating in the illegal arms trade, smuggling illegal weapons and ammunition. *Hassoon/618 Compl. ¶ 147.* As explained by John Doe No. 1, when he first arrived in Baghdad, he was asked to assist with unloading bags of dog food. As he unloaded the bags, another Blackwater employee opened them and pulled out weapons. Smuggling weapons into Iraq in bags of dog food was clearly illegal. *Decl. John Doe No. 1 ¶ 5.*

Defendant Prince keeps his killing machine in place by permitting his men to engage in child prostitution (*Hassoon/618 Compl. ¶ 148*), and use steroids and other drugs. (*Hassoon/618 Compl. ¶ 149*). Defendant Prince hides the illicit profits from his various criminal acts by evading taxes and laundering money. Defendant Erik Prince also has destroyed evidence to cover up his pattern of illegality. *Hassoon/618 Compl. ¶¶ 144-46, 150.*

Plaintiffs' RICO Complaints, measured against the standards set forth in this Circuit and by the Supreme Court, suffice to state RICO claims. *See, e.g., Foremost Corp. v. Meritor Savs. Bank,* 910 F.2d 118 (4th Cir. 1990); *United States v. Hooker*, 841 F.2d 1225 (4th Cir. 1988); *Ownby v. Cohen*, 19 F. Supp. 2d 558 (W.D. Va. 1998); *Adamson v. Alliance Mtg. Co.*, 677 F. Supp. 871 (E.D. Va. 1987).

**B.  The RICO Plaintiffs Have Standing to Assert RICO Claims.**

Defendant Erik Prince argues that the RICO Plaintiffs lack standing. Mr. Prince does not contest that the RICO Plaintiffs adequately plead property damage, as is required by *Sedima S.P.R.L. v. Imrex Co.*, 473 U.S. 479 (1985). Instead, Mr. Prince argues that the destruction of the vehicles does not meet the *Holmes v. Securities Investor Protection Corp.*, 503 U.S. 259, 268

(1992) test that requires "a direct relationship between the injury asserted and the injurious conduct alleged." *See Prince Mem.* at 17.

Plaintiffs allege that the Prince Enterprise destroyed their cars during the Nisur Square massacre and other episodes of murder.[10] *Abtan/617 Compl. ¶ 115; Hassoon/618 Compl. ¶¶ 59, 67, 79).* As set forth in the Complaints, and as admitted by Jeremy Ridgeway, the property damages occurred when Defendant Prince's men were spraying bullets from semi-automatic weapons and launching grenades into cars driven by innocent Iraqis. This is clearly a direct relationship between the predicate acts and the property damage, as the damages were caused during the commission of the predicate acts. Property damage occurring ***during***, and ***as a result of,*** the actual commission of a predicate act satisfies the *Holmes* test. 503 U.S. at 268. As a result of this direct relationship between the damage and the predicate acts, Plaintiffs have standing.

Because Defendant Prince cannot evade this direct nexus, he instead concocts a convoluted argument that the alleged predicate acts of murder are not really predicate acts. *Prince Mem.* at 10-11. Defendant Prince asserts the murders are not chargeable in Virginia because they were committed in Iraq, not Virginia. As explained above, however, Defendant Prince can be charged with murder in this Circuit, and in the state courts for both North Carolina and Virginia.

---

[10] Interestingly, it appears the civil RICO jurisprudence in this Circuit does not appear to permit standing based on the financial and economic harms that naturally attend a murder. *Bast v. Cohen, Dunn & Sinclair*, 59 F.3d 492 (4th Cir. 1995); *Byrd v. Hopson*, 265 F. Supp. 594 (W.D. N.C. 2003). For that reason, at present, only those Plaintiffs with property damages are named as RICO Plaintiffs. Plaintiffs respectfully reserve the right to amend and add additional Plaintiffs if further research reveals the basis for a reasoned argument to change the law.

### C.  *Defendant Erik Prince's Misconduct Occurred in the United States.*

Defendant Erik Prince cannot evade liability for his racketeering merely because some of the deaths occurred in Iraq.  Here, Mr. Prince may be charged with murder in the federal courts, North Carolina and Virginia as a result of his acts.  His culpable conduct occurred primarily here in the United States.  As is established by the authority cited by Mr. Prince, *Butte Mining PLC v. Smith*, 76 F.3d 287 (9th Cir. 1996), and other RICO jurisprudence such as *North South Finance Corp. v. Al-Turki,* 100 F.3d 1046 (2d Cir. 1996), the federal district courts may apply RICO if a significant part of the predicate acts occurred in the United States.

In addition to the murders themselves begin chargeable in the United States, the RICO Complaints allege a substantial number of other predicate acts occurring in the United States. *See Abtan/617 Compl. ¶ 139*; *Hassoon/618 Compl.  ¶ 150* (alleging that Erik Prince violated Section 7201 of the Internal Revenue Code by failing to pay taxes).  As further set forth in Exhibits E and F, Erik Prince has been making misrepresentations to the Internal Revenue Service for many years in an effort to avoid paying taxes.  Defendant Prince has repeatedly characterized his employees as "independent contractors" (and indeed continues to do so in his legal papers) despite being advised not to do so by the IRS.  The IRS stated in a letter dated March 30, 2007 to Blackwater Security Consulting LLC, "your statement that the worker was an independent contractor pursuant to a written agreement is without merit." *See Exhibit E*.  After the IRS advised him that his scheme was illegal, Mr. Prince tried to suppress and hide the IRS ruling from law enforcement officials.  *See Statement of Facts* and *Exhibit F.*

Here, as alleged in the RICO Complaints, RICO Defendant Erik Prince runs his Enterprise from his offices in McLean, Virginia.  *Hassoon/618 Compl. ¶ 129; Abtan/617 Compl.*

¶ *117.* Discovery will show Mr. Prince often conducts his criminal Enterprise from the North Carolina location and also uses the Huntington Bank in Michigan. *See Exhibit I.*

Defendant Prince's directions to his Enterprise occur in the United States. For example, as explained by John Doe No. 2, Defendant Prince sent back to Iraq men who had been returned to the U.S. after being found "unfit to deploy for various reasons," including excessive drinking and steroid use. *Decl. John Doe No. 2* ¶ 13. These "demonstrably unfit men" had been returned to the United States by Blackwater employees located overseas, but Erik Prince and his executives sent them back to Iraq with express instructions to the concerned employees that they needed to "stop costing the company money." *Decl. John Doe No. 2* ¶ 13.[11]

In sum, this Court should not dismiss Plaintiffs' RICO claims on a motion to dismiss. The RICO Plaintiffs have standing, as they suffered property damages caused by the commission of predicate acts. Plaintiffs have properly plead their claims, which allege substantial conduct and effects in the United States.

### III. PLAINTIFFS STATE VALID FEDERAL COMMON LAW TORT CLAIMS FOR WAR CRIMES AND SUMMARY EXECUTION.

In addition to being actionable under RICO, Mr. Prince's egregious acts give rise to civil liability under federal common law. There are two sources of federal common law applicable here. First, as explained in Subsection A, federal common law developed under the Alien Tort Statute ("ATS"), 28 U.S.C. § 1350 applies. (Section IV, below, sets out why Plaintiffs are

---

[11] Moreover, even if the Complaints alleged only predicate acts occurring abroad (which they do not), RICO may be applied to conduct that has domestic effects. *John Doe I. v Unocal*, 395 F.3d 932 (9th Cir. 2002); *United States v. Noriega*, 746 F. Supp. 1506, 1516-17 (S.D. Fla. 1990) (RICO applies to narcotic trafficking if racketeering produces effects within the United States). Here, Mr. Prince's misconduct has had significant impact on the United States, as is evidenced by the pending Department of Justice criminal prosecution.

entitled to to seek punitive damages.)  Second, as explained in Subsection B,  even were the ATS

not to exist, under 28 U.S.C. § 1331 federal common law would look to the War Crimes Act, 18

U.S.C. § 2441(d)(1)(2006), which penalizes the very conduct at issue here, and customary

international law to fashion the applicable tort standard.

### A.    *The Federal Common Law Under ATS Provides for Civil Liability for War Crimes and Summary Execution.*

Plaintiffs' Complaints state valid federal common law claims for war crimes and

summary execution.  In the United States, the Supreme Court has ruled that aliens are permitted

to bring damage claims for breaches of customary international law in federal district courts

using the jurisdictional grant of the Alien Tort Statute ("ATS"), 28 U.S.C. § 1350.  *Sosa v.*

*Alvarez-Machan*, 542 U.S. 692 (2004).  There, the Supreme Court confirmed that federal

common law prohibits and penalizes conduct that violates international law.  *Sosa*, 542 U.S. at

730. However, the Court cautioned that only those international laws that are well established

and defined with specificity qualify for incorporation into American federal common law.  *Id.* at

725.   In so doing, the Court recognized that international law is part of federal common law. *Id.*

The *Sosa* Court held, therefore, that modern federal courts could, "albeit cautiously," identify

justiciable claims by looking to the "customs and usages of civilized nations." *Id.* at 734, citing

*The Paquete Habana*, 175 U.S. 677, 700 (1900).

These types of international laws are called "norms" by the Court.  In so limiting federal

common law to these "norms" that qualify based on specificity and history of establishment, the

Supreme Court expressly cautioned that it was not excluding norms governing individual

relationships rather than sovereign relationships.  The Supreme Court explained norms included

"a second, more pedestrian element [that fell within the judicial sphere of] ***regulating the***

*conduct of individuals situated outside domestic boundaries and consequently carrying an international savor*." *Sosa,* 542 U.S. at 715 (emphasis added).  The Court explained that there was "a sphere in which these *rules binding individuals for the benefit of other individuals overlapped with the norms of state relationships*." *Id.*  Acting cautiously and giving due deliberation to the dissenting argument (J.Scalia), the *Sosa* Court decided that "the door [for such ATS federal common law claims] is still ajar subject to vigilant doorkeeping, and thus open to a narrow class of international norms today." *Id.* at 729.

It is these so-called "pedestrian norms" protecting individuals that are at issue here – namely, the international norms that prevent persons from using the cloak of conflict and war to engage in murder and mayhem for their own profit and benefit.  For that reason, the Plaintiffs bring their war crimes and summary execution claims under federal common law, and seek compensatory and punitive damages from Defendant Prince and his alter ego companies.

It is beyond dispute that the prohibition against war crimes qualifies as part of the federal common law enforceable in this jurisdiction.  The *Sosa* Supreme Court found war crimes qualify as norms with the necessary "specific, universal, and obligatory" definitions.  *Id.* at 732. Indeed, the prohibition against war crimes is one of the most well-established and is codified at the Fourth Geneva Convention relative to the Protection of Civilians in Time of War (1949), Article 3(1)(a).

There is no requirement that the alleged war criminal be a "party to the conflict" or a "combatant" as Blackwater suggests.  *Prince Mem.* at 11.  In 1996, Congress enacted the War Crimes Act, 18 U.S.C. § 2441 (1996), which provided for criminal liability for war crimes when "the person committing such war crime or the victim of such war crime is a member of the Armed Forces of the United States or a national of the United States."  The Department of

- 35 -

Defense requires contractors to notify their American employees that they are subject to prosecution under the War Crimes Act. *See* 48 C.F.R. § 252.225-7040(e)(2)(ii).[12]

Defendant Prince and his companies dispute that summary executions are cognizable claims, arguing that they fail to state claims unless those executions occurred during genocide or war crimes. *Prince Mem.* at 6. This argument fails on a Rule 12(b)(6) motion for dismissal because Plaintiffs clearly have alleged that Defendant Prince and his companies were committing war crimes, and the summary executions occurred during the commission of war crimes. *Abtan/617 Compl. ¶ 76; Albazzaz/616 Compl. ¶ 33; Hassoon/618 Compl. ¶ 90; Rabea/645 Compl. ¶ 23; Sa'adoon/615 Compl. ¶ 38.* Thus, what Defendants are really seeking from this Court is an early factual finding in its favor. Such a finding would be wholly premature. Defendants are free to argue to the jury that gunning down innocent Iraqis should not be considered war crimes. But their motion to dismiss must be denied.

Further, even if Plaintiffs had not alleged Defendants committed the summary executions during the commission of war crimes, Plaintiffs' allegations would still state an actionable violation of a clear and definite norm of international law. The Supreme Court so held in *Sosa,* 542 U.S. at 728, and again in *Hamdan v. Rumsfeld*, 548 U.S. 557, 630 (2006) (finding that

---

[12] Blackwater errs as matter of law in asserting that a political or military motive is an element of war crimes. *Prince Mem.* at 11-12. It is not. *See* War Crimes Act, 18 U.S.C. § 2441 (1996). The United Nations International Criminal Tribunal for the former Yugoslavia Appeals Chamber also rejected precisely this argument, finding: "What ultimately distinguishes a war crime from a purely domestic offence is that a war crime is shaped by or dependent upon the environment – the armed conflict – in which it is committed. It need not have been planned or supported by some form of policy." *Prosecutor v. Kunarac et al*, Case Nos. IT-96-23 & IT-96-23/1-A, June 12, 2002, ¶ 58; s*ee also Prosecutor v. Jelisic*, Case No, IT-97-10-A, July 5, 2001, ¶ 49 ("The personal motive of the perpetrator of the crime of genocide may be, for example, to obtain personal economic benefits, or political advantage of some form of power. The existence of a personal motive does not preclude the perpetrator also from have the specific intent to commit genocide.").

international law prohibits executions not carried out by regularly constituted courts). *See also Alejandre v. Republic of Cuba*, 996 F. Supp. 1239, 1252 (S.D. Fla. 1997) ("Like the torture in *Filartiga*, the practice of summary execution has been consistently condemned by the world community"); *Cabello v. Fernandez-Larios*, 402 F.3d 1148, 1157 (11th Cir. 2005); *Wiwa v. Royal Dutch Petroleum Corp.,* 226 F.3d 88, 105 (2d Cir. 2000); *Mujica v. Occidental Petroleum Corp.,* 381 F. Supp. 2d 1164, 1178-79 (C.D. Cal. 2005); *In re Estate of Ferdinand Marcos Human Rights Litig.*, 25 F.3d 1467, 1475 (9th Cir. 1994); *Wiwa v. Royal Dutch Petroleum Corp.,* 2009 U.S. Dist. LEXIS 57081 (Apr. 23, 2009) at *14, n.4; *Almog v. Arab Bank, PLC*, 471 F. Supp. 2d 257, 271 (E.D.N.Y. 2007).   *See also* S. Rep. No. 102-249, at 3 (1991) (finding that summary execution was universally condemned and assumed the status of customary international law).

### B.  *Federal Common Law May Be Based on the Federal Criminal War Crimes Statute and Customary International Law.*

Further, the relevant federal common law is not limited to the *Sosa* concept of international norms.  It is well-settled that 28 U.S.C. §1331 provides jurisdiction for claims arising under federal common law.  *See, e.g., Illinois v. City of Milwaukee,* 406 U.S. 91, 99-100 (1972). "Although the issue was at one point in doubt, *see T.B. Harms Co. v. Eliscu,* 339 F.2d 823, 827-28 (2d Cir.1964) (Friendly, J.), *cert. denied,* 381 U.S. 915 (1965), there is no longer any question that the word "laws" in § 1331(a) embraces claims founded upon federal common law." *Provident Life & Acc. Ins. Co. v. Waller,* 906 F.2d 985, 989 (4th Cir. 1990).

Here, the Court should look to two sources in addition to ATS jurisprudence for the applicable tort standard that should be applied to civil claims for war crimes and summary execution.  First, a federal criminal statute prohibits the very conduct at issue here.  *See, e.g.,*

- 37 -

War Crimes Act, 18 U.S.C. § 2441(d)(1)(2006).  Borrowing the standard from that federal law

is entirely appropriate, as the federal law permits Mr. Prince and his Blackwater companies to

defend themselves by various means, such as establishing the deaths constitute "collateral

damage" to authorized governmental acts.  Such borrowing of federal criminal statutes has been

done in similar contexts.  *See, e.g., Kadic v. Karadzic*, 70 F.3d 232, 242 (2d Cir. 1995) (federal

common law developed using criminal statute prohibiting genocide); *In re South African

Apartheid Litigation*, 617 F. Supp. 2d 228, 254 (S.D.N.Y. 2009) (borrowing standard from War

Crimes Act to inform tort proceedings against private corporation).

        Second, federal courts look to international law when interpreting federal statutes or

applying federal common law. *See, e.g., Weinberger v. Rossi*, 456 U.S. 25, 29-30, 32-33 (1982);

*McCulloch v. Sociedad Nacional de Marineros de Honduras*, 372 U.S. 10, 21 (1963). *See also,

Sosa v. Alvarez-Machain,* 542 U.S. 692, 716-721.  Indeed, in *Sosa*, the Supreme Court expressly

preserved this ability to refer directly to international law for guidance in shaping federal

common law, particularly for "any international norm intended to protect individuals." *See Sosa*,

542 U.S. at 729-730, citing *Banco Nacional de Cuba v. Sabbatino,* 376 U.S. 398, 423 (1964);

*The Paquete Habana*, 175 U.S. 677, 700 (1900); *The Nereide*, 9 Cranch 388, 423 (1815)

(Marshall, C.J.); and *Texas Indus., Inc. v. Radcliff Materials, Inc.,* 451 U.S. 630, 641 (1981).

Thus, the Court is able to look to the Geneva Conventions and other customary international law

sources to provide content to the federal common law governing these lawsuits.  This path of

looking directly to customary international law  reaches essentially the same end result as

applying international norms pursuant to the ATS, albeit by slightly different means.   The

Supreme Court simply preserved this path as an expression of the importance of the body of

international law protecting individuals from human rights abuses, such as those that occurred

here at the hands of Mr. Prince and his Blackwater companies.

### C. Defendant Prince and the Alter Ego Companies are Not Excused from Liability for War Crimes And Summary Execution Merely Because They are Private Parties, Not Government Officials.

Defendants are simply wrong as a matter of law when they assert (*Prince Mem.* at 5-6)

that only government officials (so-called "state actors") may be held liable for war crimes and

summary execution.  The Supreme Court held in *Sosa* that private parties can be held liable for

violations of the law of nations. *Sosa*, 542 U.S. at 715.  In addition to the discussion about

"pedestrian" norms (cited at *Opposition*, 33, above) that explains individual liability is an

important element of international law, the Court cited examples.  *See, e.g.,* discussion of

Longchamps, a French adventurer (*Sosa*, 542 U.S. at 716-17); discussion regarding cases arising

out of piracy and prize captures (*Id.* at 720); cases against privateers (*Id.*, citing *Bolchos v.*

*Darrel*, 3 F. Cas. 810 (No.1,607) (D.S.C. 1795); and the 1795 Opinion of Attorney General

Bradford, discussing a civil suit that could be brought against Americans who had taken part in

the French plunder of a British slave colony in Sierra Leone. (*Id.* at 721).  Notably, the definition

of piracy included that one was a *private actor*, as explained by *United States v. Smith*, 18 U.S.

153, 160-63 (1820) (cited in *Sosa* for the proposition that the case illustrated the specificity with

which the law of nations defined piracy.  *Sosa,* 542 U.S. at 732). Mr. Prince and his companies

ignore the binding Supreme Court precedents, and cite instead the Court of Appeals for the

Second Circuit decision, *Kadić,* claiming that the appellate decision stands for the proposition

that summary execution always requires state action. 70 F.3d 232 (2d Cir. 1995). Even were this

Court bound by the Second Circuit (which of course it is not), the decision does not compel the

result sought by Defendants.  In *Kadić,* the Second Circuit looked only at whether the federal

Torture Victims Protection Act ("TVPA") required state action. 70 F.3d at 243. That statute is not invoked here, and that decision has no bearing on the more general issue as to whether summary execution requires state action.

On that issue, federal common law controls, and does not require state action as a prerequisite to asserting summary execution claims. *See* War Crimes Act, 18 U.S.C. § 2441(d)(1)(2006); s*ee also* Fourth Geneva Convention, Art. 3; Civil and Political Rights, Including Questions of Disappearances and Summary Executions, Extrajudicial, Summary or Arbitrary Execution, Report of the Special Rapporteur, Philip Alston, E/CN.4.2005/7, ¶ 6, Dec. 22, 2004.[13] Indeed, the Executive Branch expressed its view to this effect in the *Kadić* proceedings. 70 F.3d at 239-40 ("The Executive Branch has emphatically restated in this litigation its position that private persons may be found liable under the Alien Tort Act for acts of genocide, war crimes and other violations of international humanitarian law.")

Defendants also err as a matter of law when they assert the TVPA provides an exclusive basis by which to bring claims for summary execution. Both the legislative history and the Supreme Court's decision in *Sosa* rejected this very argument, finding that TVPA was intended to compliment, not replace, the ATS. H.R. Rep. No. 102-367, pt. 1, p.3-4 (1991); *Sosa*, 542 U.S. at 728 (recalling that jurisdiction under the ATS was to "remain intact" after the adoption of the TVPA); *Id*. at 731 (finding that the TVPA "supplement[s]" the ATS); *see also Aldana v. Del Monte Fresh Produce, N.A., Inc.*, 416 F.3d 1242, 1250-51 (11th Cir. 2005); *Bowoto v. Chevron Corp.*, 557 F. Supp. 2d 1080, 1085 (N.D. Cal. 2008). Defendants mislead the Court by arguing otherwise.

---

[13] Notably, the Special Rapporteur on Extrajudicial, Summary or Arbitrary Execution included accounts of "indiscriminate or otherwise questionable use of force against civilians" by security companies in his United States Mission Report. *See* A/HRC/11/2/Add.5, May 28, 2009 at ¶ 46.

In sum, federal common law opens the courthouse doors to Plaintiffs' claims arising from misconduct during the war in Iraq.[14]  Ignoring the controlling jurisprudence, Mr. Prince asks this Court to slam the courthouse doors shut and protect him from any financial liability for his own bad acts.  (These bad acts are the subject of multiple grand jury investigations, and one pending criminal action.)  But Mr. Prince fails to advance any legally compelling reason why this Court should shut the courthouse doors to innocent Iraqis who were harmed by Mr. Prince and his companies.

### IV.  PLAINTIFFS PROPERLY PLEAD THE FACTS NECESSARY FOR LIABILITY.

Mr. Prince, whether by design or inadvertence, wholly ignores the fact that Plaintiffs seek to hold him personally and directly liable for the deaths and injuries.  Mr. Prince instead focuses on various forms of "secondary liability," and claims Plaintiffs failed to plead properly.  This is simply not the case.

#### A.  Plaintiffs Properly Plead Facts Establishing Mr. Prince's Direct Liability.

Mr. Prince asserts Plaintiffs "do not explain the theory of secondary liability that they mean to invoke."  *Prince Mem.* at 9.   Mr. Prince then argues that his companies cannot be liable, citing to *The Nuremberg Trial*, 6.F.R.D. 69, 100 (1946) for the proposition that "[c]rimes against international law are committed by men, not by abstract entities, and *only by punishing*

---

[14] As an aside, opening the door also serves to fulfill an important constitutional obligation. Opening the door fulfills our obligations under the Geneva Conventions and the common law of war, both of which require our nation (as the "sending state") to provide adjudicatory process to those injured by misconduct during war time.  *See, e.g.* the Bremer Order, discussed below at page 64. In short, exercising jurisdiction over this action not only benefits the Plaintiffs, but also benefits the United States and conforms to the rule of *Murray v. Schooner Charming Betsy*, 6 U.S. (2 Cranch.) 64, 118 (1804).

*individuals who commit such crimes can the provisions of international law be enforced.*"
(Emphasis added.)  This is wrong for two reasons:

First, federal common law governs who may be held liable in the United States for
committing war crimes and summary execution.  The War Crimes Act makes it clear that non-
state persons may be held liable.  *See also Meyer v. Holley, 537 U.S. 280, 285 (2003)* (using
common law to establish that the Federal Housing Act provides for vicarious liability)*; Kadic v.
Karadzic*, 70 F.3d 232, 242 (2nd Cir. 1995) (federal common law developed using criminal
statute prohibiting genocide); *In re South African Apartheid Litigation*, 617 F.Supp.2d 228,
254 (S.D.N.Y. 2009) (borrowing standard from War Crimes Act to inform tort proceedings
against private corporation). S*ee also Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 754-55
(1998) (fashioning a "uniform and predictable standard" of vicarious liability in Title VII actions
"as a matter of federal law."); *Davidson v. Enstar Corp.*, 848 F.2d 574, 577 (5th Cir. 1988)
(applying federal joint venture test, distinct from Louisiana's idiosyncratic joint venture rules, to
federal statutory claims); *Beck v. Prupis*, 529 U.S. 494 (2000) (turning to the federal common
law to determine the principles of liability under RICO).  Thus, this Court should use well-
established federal common law tort principles on liability to instruct the jury at trial on the
extent and scope of the persons who may be held liable for war crimes and summary execution.

Second, and importantly, Defendant Prince and his companies wholly ignore and fail to
address the fact that Plaintiffs' lawsuits allege ***direct*** liability.  The lawsuits allege that Mr.
Prince perpetrated murder on repeated occasions.  *Abtan/617 Compl.  ¶¶ 121-132*; *Albazzaz/616
Compl. ¶ 14*; *Hassoon/618 Compl. ¶¶ 133-143*; *Rabea/645 Compl. ¶¶ 1-2; Sa'adoon/615 Compl.
¶ 16*. He did so for two reasons: to make money and to eliminate persons of Islamic faith.
*Abtan/617 Compl. ¶¶ 3, 119*; *Hassoon/618 Compl. ¶ 131*; *Decl. John Doe No. 2 ¶¶ 9-10, 12*

- 42 -

("Mr. Prince is motivated by greed" and thinks that he is "tasked with eliminating Muslims and the Islamic faith from the globe").

Thus, Defendant Prince is directly, not vicariously, responsible for the killings and woundings.[15]  As explained above, Mr. Prince is able to be charged with murder in both Virginia and North Carolina, Mr. Prince recruited and deployed persons willing to kill Iraqis for sheer sport.  *Decl. John Doe No. 2 ¶¶ 10-11.*

Mr. Prince could have stopped the wanton killings by listening to his employees.  *Decl. John Doe No. 2 ¶ 13.*  But instead, Iraqis were shot and killed until the Nisur Square massacre occurred.[16]  After the massacre, the public scrutiny forced Mr. Prince to scale back on the scope of his misconduct in Iraq, and, as discovery will show, the killings and woundings dropped dramatically and immediately.

As even Defendants concede, federal common law permits direct actions against natural persons who commit war crimes and summary execution.  Such actions are permitted by customary international law, which becomes part of federal common law.  *Sosa v. Alvarez-*

---

[15] Moreover, war crime and summary execution claims clearly may be brought under many modes of liability, including directly or indirectly facilitating, ordering, acquiescing, confirming, ratifying and/or conspiring with others to act.  All such modes of liability apply to ATS claims.  *See, e.g., Cabello v. Fernandez-Larios*, 402 F.3d 1148, 1157 (11th Cir. 2005) (ATS "reaches conspiracies and accomplice liability"); *Bowoto v. Chevron*, 2008 U.S. Dist. LEXIS 54728, at *33-35(N.D. Cal. May 30, 2008); *Aguasanta Arias v. Dyncorp*, 517 F. Supp. 2d 221, 227-228 (D.D.C. 2007); *Wiwa v. Royal Dutch Petroleum*, Case No. 96 CIV 8386 2002 WL 319887 (S.D.N.Y.  Feb. 28, 2002) (corporate defendant liable for "joint action" with state actors).  Further, Mr. Prince confuses conspiracy as a substantive offense with conspiracy as a mode of civil liability. *Prince Mem.* at 9.  In *Hamdan v, Rumsfeld*, the Court rejected conspiracy as a triable *offense,* yet preserved conspiracy as a mode of liability.  548 U.S. 557, 610, 611 n. 40 (2006).

[16] Defendants imply that all of these deaths are simply the by-product of the war by citing the total number of military deaths in their footnotes. But if that were the case, other companies guarding government officials would reveal similar patterns of shooting deaths and woundings. As will be demonstrated at trial, records from other companies reflect the opposite reality.

*Machin*, 542 U.S. 692, 724 (2004). Although Plaintiffs' lawsuits also name all the various

company names that Mr. Prince uses to implement his plan of devastation, all of these various

companies act as alter egos for Mr. Prince, and do not eradicate his responsibility. *Decl. John*

*Doe No. 2 ¶ 8; Albazzaz/616 Compl. ¶ 9; Sa'adoon/615 Compl. ¶ 10; Rabea/645 Compl. ¶ 10;*

*Abtan/617 Compl. ¶ 38; Hassoon/618 Compl. ¶ 27.* As such, these companies may also be

directly, not secondarily, liable for war crimes and summary execution.

### B. The Prince Companies May Be Held Liable for Committing War Crimes and Summary Execution.

Here, Plaintiffs allege the Prince Companies acted as Mr. Prince's alter ego, simply

extending the scope of his personally-directed misconduct. But even if Plaintiffs were bringing

claims against a publicly-traded corporation who did not act as any natural person's alter ego,

such claims would survive a motion to dismiss. As the Supreme Court commented in *Argentine*

*Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 438 (1989), ATS "by its terms does

not distinguish among classes of defendants." *See also Khulumani v. Barclay National Bank,*

*Ltd.*, 504 F.3d 254, 282 (2nd Cir. 2007) (Katzman, J., concurring) (noting that "[w]e have

repeatedly treated the issue of whether corporations may be held liable under the ATCA as

indistinguishable from the question of whether private individuals may be."); *id.* at 289 (Hall, J.,

concurring) (corporations may be liable under the ATS in cases if it "played a knowing and

substantial role in the violation of a clearly recognized international law norm"); *Abdullahi v.*

*Pfizer, Inc.,* 562 F.3d 163 (2d Cir. 2009) (corporation held liable for violating international law

in its clinical testing); *Beanal v. Freeport-McMoran, Inc.*, 197 F.3d 161, 163 (5th Cir. 1999);

*Romero v. Drummond Co.,* 552 F.3d 1303, 1314-16 (11th Cir. 2008); *In re Agent Orange*

*Product Liab. Litig.*, 373 F. Supp. 2d at 58 ("Limiting civil liability to individuals while

- 44 -

exonerating the corporation directing the individual's action through its complex operations and changing personnel makes little sense in today's world."); *Arias v. Dyncorp*, 517 F. Supp. 2d 221, 227-228 (D.D.C. 2007); *Bowoto v. Chevron Corp.*, 2006 U.S. Dist. LEXIS 63209, *37 (N.D. Cal. 2006) ("There is very little reason to differentiate between corporations and individuals.")

In sum, as a matter of law, corporations and companies such as the Prince companies may be held both directly and indirectly liable for violating federal common law prohibiting war crimes and summary executions. The Complaints adequately plead both direct and indirect liability by the Prince companies. Even if the Complaints are not adequate, Plaintiffs should be permitted an opportunity to amend, as the facts clearly support both direct and secondary liability. *See Decl. John Doe No. 2* ¶¶ 2, 4, 6-8.

## V. PUNITIVE DAMAGES ARE AVAILABLE FOR VICTIMS OF WAR CRIMES AND SUMMARY EXECUTION.

Defendant Prince and the companies, relying on a single academic commentary, state without qualification that punitive damages cannot be awarded for federal common law claims brought by aliens under the ATS. *Prince Mem.* at 12-13. Defendants mislead the Court by this overstatement. The leading treatise, American Restatement of Foreign Relations Law, asserts that "[i]f a violation is not merely a delict but an international crime . . . punitive damages may be awarded." *Restatement (Third) of Foreign Relations Law* § 901(e)(5) (1997).[17] But even more importantly, federal courts routinely and regularly permit juries to award punitive damages

---

[17] Even the 2000 commentary cited by Defendants (Nina H. B. Jorgensen, *The Responsibility of States for International Crimes* 200-201 (2000)) admitted that "[m]ore recently, the trend has been to treat punitive damages as an independent notion." Ms. Jorgensen found that "the question of punitive damages has arisen in the context of human rights and . . . unlawful killings." *Id.* at 201.

for egregious acts that violate international law. *See, e.g., Filartiga v. Pena-Irala*, 577 F. Supp. 860 (E.D.N.Y. 1984) (awarding $10,000,000 total to two Paraguayan nationals for torture and wrongful death); *Quiros de Rapaport, et al., v. Suarez-Mason*, No. C87-2266 JPV (N.D.Cal. 1989) (awarding $10,000,000 in punitive damages to a victims' widow, and $5,000,000 in punitive damages each to victims' mother and sister) *Paul v. Avril*, 901 F. Supp. 330 (S.D. Fla. 1994) (awarding six Haitian nationals each $4,000,000 in punitive damages); *Abebe-Jira v. Negewo*, 72 F.3d 844 (11th Cir. 1996) (affirming the district court's award of $300,000 in punitive damages); *Doe v. Karadžić*, U.S. Dist. LEXIS 122928 (S.D.N.Y. 2001) (awarding total of $4,500,000,000 in compensatory and punitive damages for claims including genocide, war crimes and extrajudicial killing to 22 plaintiffs). *See also Lizabre v. Hurtado*, CA 07-21783 (S.D. Fla. Mar. 4, 2008) (Jordan, J.) (awarding compensatory damages totaling $12,000,000 and punitive damages totaling $25,000,000 to ten plaintiffs bringing wrongful death claims); *Xuncax v. Gramajo*, 886 F. Supp. 162 (D. Mass. 1995) (awarding nine plaintiffs punitive damages in excess of $750,000 each for wrongful death arising out of summary execution, torture, arbitrary detention and disappearance); *Hilao v. Estate of Marcos,* 103 F.3d 767, 781 (9th Cir. 1996) (affirming district court's entry of a jury award of $1.2 billion in punitive damages for breaches of international law).

It is unclear why Defendants failed to advise the Court of these many instances of punitive damages awards. Plaintiffs are properly permitted to ask the jury to award punitive damages consistent with the Supreme Court's recent rulings in *Philip Morris USA v. Williams,* 549 U.S. 346 (2007) and *Exxon Shipping Co. v. Baker*, 128 S.Ct. 2605 (2008).

### *VI. PLAINTIFFS ASSERT VALID STATE COMMON LAW CLAIMS  NOT BARRED BY ANY DOCTRINE OR LAW.*

In addition to trying to defeat RICO and ATS jurisdiction, Defendant Prince and the companies serve up a smorgasbord of reasons why this Court cannot hear the victims' additional state law claims for wrongful death, assault and battery, and negligent hiring, supervision and training.  They argue some Counts are non-justiciable attacks on the United States' conduct of diplomacy (*Prince Mem.* at 22-29), certain Counts are barred by the absolute immunity flowing to the United States (*Prince Mem.* at 39) and by the limited immunity found under the affirmative government contractor defense (*Prince Mem.* at 37-39).  Defendant Prince and the companies argue both that the lawsuit must be subjected to Iraqi law, but is immunized from Iraqi law by virtue of the Bremer Order.  (*Prince Mem.* at  32-35).  Finally, although claiming Iraq law controls and requires dismissal, they nonetheless invoke various Virginia statutes to argue the claims must be dismissed.  (*Prince Mem.* at 40-44).

None of these various and contradictory arguments persuades.  First, these lawsuits do not raise political questions.  Rather, these lawsuits challenge egregious misconduct by Mr. Prince and his companies, which has harmed the United States' interests and is the subject of pending federal criminal proceedings.  *See Subsection A.*

Second, the negligent hiring and training count challenges conduct by Mr. Prince and his companies, not decisions made by the United States Department of State.  Neither the government contractor defense nor the doctrine of absolute immunity compels dismissal of these counts.  *See Subsection B and C.*

Third, the victims' Complaints state valid claims regardless of whether Iraqi, Virginia or North Carolina law applies.  Although it is premature for the Court to decide the choice-of-law

issues, genuine experts in Iraqi law (*i.e.* not American lawyers) opine that the claims raised

would be able to proceed in Iraqi courts.  *See Subsection D.*

Fourth, the Plaintiffs are either excused from compliance with, or have complied with,

the various Virginia statutes cited by Mr. Prince and his companies.  *See Subsection E* .

### A.    *These Lawsuits Do Not Raise a Political Question.*

Mr. Prince and his companies attach a voluminous appendix of excerpts from a State

Department contract, and argue that Plaintiffs are asking this Court to "second-guess a myriad of

State Department decisions about how best to provide security services in a war zone…"  *Prince*

*Mem.* at 22.  This is simply wrong.  The attached excerpts and Mr. Prince's brief describing

those excerpts have no relevance to the claims.

Plaintiffs are alleging that Mr. Prince and those acting under his direction intentionally

and knowingly killed and wounded innocent Iraqis.  They did so not to further the State

Department's goals, but their own illicit goals.  Had Mr. Prince and his men abided by the terms

of the State Department contract, and used lethal force only when necessary, the Plaintiffs would

not have lost their loved ones.  Plaintiffs are also alleging in the alternative that Mr. Prince and

those acting under his direction negligently killed and wounded innocent Iraqis by woefully

failing to screen for suitability the men who were deployed to Iraq.  *See, e.g., Decl. John Doe*

*No. 2* ¶ 13, explaining that men were deployed despite being known to be using steroids.

Furthermore, Blackwater failed to discipline its employees who used excessive force, instead

allowing them to serve on the State Department contract. *Decl. John Doe No. 1* ¶¶ 6, 7, 12, 22.

*See Abtan Compl.* ¶¶ 50, 107.   Indeed, in the case of at least one Blackwater employee, who

used excessive and unjustified force on more than one occasion and bragged about his "kill,"

Blackwater refused the request of his supervisor that he be placed on the "Do Not Use" list.

*Decl. John Doe No. 1* ¶¶ 25-26. Employees who were deemed unsuitable for deployment in Iraq for various reasons were returned to Iraq. *Decl. John Doe No. 2* ¶ 13.

The Department of Justice has criminally indicted Mr. Prince's men. One of them has already pled guilty to manslaughter, 18 U.S.C. §§ 3261(a)(1), 1112, and attempt to commit manslaughter, 18 U.S.C. §§ 3261(a)(1), 1113. *See* Exhibit C, Factual Proffer in Support of Guilty Plea, Jeremy P. Ridgeway, November 18, 2008. Given that the Executive Branch itself has voluntarily submitted to the judiciary the resolution of the question of whether Mr. Prince's men acted properly or not, it strains credibility to argue this Court needs to refrain from exercising jurisdiction out of deference to the Executive Branch and separation of powers.

Supreme Court political question jurisprudence and the Court of Appeals for the Fourth Circuit's decision in *Tiffany v. United States*, 931 F.2d 271 (4th Cir. 1991) compel this Court to deny Mr. Prince's invocation of the political question doctrine. The political question doctrine was intended to protect against judicial overreaching into executive and legislative functions. *See Marbury v. Madison,* 1 Cranch 137, 164-166, 2 L.Ed. 60 (1803); *Occidental of Umm al Qaywayn, Inc. v. A Certain Cargo of Petroleum Laden Aboard Tanker,* 577 F.2d 1196, 1203 (5th Cir. 1978) ("[T]he genesis of the political question is the constitutional separation and disbursement of powers among the branches of government."). But as the Supreme Court warned in the seminal case, *Baker v. Carr,* 369 U.S. 186, 211 (1962), "it is error to suppose that every case or controversy which touches foreign relations lies beyond judicial cognizance."[18]

---

[18] A District Court (J. Lee) in this District ruled in a case cited by Defendants, *Al Shimari v. CACI Premier Tech., Inc*., 2009 U.S. Dist. LEXIS 29995 (E.D.Va. Mar. 18, 2009), that the political question did not bar the judiciary from hearing claims of misconduct during detentions. Defendants cite this opinion for the proposition that Plaintiffs fail to state claims under ATS. As explained above, however, controlling Supreme Court precedents compel the opposite result as that reached in *Al Shimari.*

The judiciary does not overreach by hearing and ruling on disputes that arise during a war. The Supreme Court has repeatedly ruled that not all disputes that touch on the President's war powers and combat raise political questions. For example, the Supreme Court reversed a presidential directive ordering the seizure of steel mills to protect the production of armaments for the Korean War, *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952), and reviewed on the merits a presidential order resolving the Iranian hostage crisis, *Dames & Moore v. Regan*, 453 U.S. 654 (1981).

The acts at issue here occurred in the midst of the Iraq war. That fact clearly does not deprive the judiciary of its power. As the Supreme Court ruled in *Hamdi v. Rumsfeld,* 542 U.S. 507 (2004), and again in *Boumediene v. Bush*, 128 S.Ct. 2229, 2277 (2008), that the federal courts are obliged to hear disputes even when they arise an "important incident[] of war," *Hamdi,* 542 U.S. at 518 (2004). This Court rejected the application of the political question doctrine to the question of whether a U.S. citizen may be held as an "unlawful enemy combatant." *United States v. Lindh*, 212 F. Supp 2d 541 (E.D. Va. 2002). Indeed, this Court warned "[b]ecause the consequence of accepting a political question argument is so significant— judicial review is completely foreclosed—courts must subject such argument to searching scrutiny." *Id.* at 555-56. It found that while "some of the triggering circumstances" of *Baker* were present, others were "plainly not." *Id.* at 556.

Wars are simply not the litigation-free zones that Mr. Prince wants them to be. Although Mr. Prince and his companies rely almost exclusively on an Eleventh Circuit decision in *Carmichael v. Kellogg, Brown & Root Servs., Inc.,* No. 08-14487, F.3d, 2009 WL 1856537 (11th Cir. June 30, 2009) to argue political question, this Court is bound to follow the Supreme Court jurisprudence, not the Eleventh Circuit. Even if this Court were to follow the reasoning of

the Eleventh Circuit, two other decisions ruled on facts much closer to the facts alleged here that

the claims were justiciable. *Lane v. Halliburton*, 529 F.3d 548, 558-560 (11th Cir. 2008) and

*McMahon v. Presidential Airways, Inc.,* 502 F.3d 1331 (11th Cir. 2007).  As discussed more

fully below, Mr. Prince is very familiar with the latter action, as Presidential Airways his one of

his companies.  There, his pilots killed an American serviceman.[19]  When the widow sued, Mr.

Prince tried to prevent judicial review of his men's misconduct, by alleging the Courts lack the

power to hear any challenges to the operations of his empire because he was working for the

United States.

The Supreme Court's *Baker v. Carr,* 369 U.S. 186, 217 (1962) decision guides the

analysis.  There are six factors that prevent a federal district court from exercising jurisdiction:

(1) a textually demonstrable constitutional commitment to the Executive Branch, (2) the

impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial

discretion; (3) the impossibility of a court's undertaking independent resolution without

expressing lack of the respect due coordinate branches of government; (4) an unusual need for

unquestioning adherence to a political decision already made; (5) the potentiality of

embarrassment from multifarious pronouncements by various departments on one question; and

(6) judicially unmanageable need for discovery.  None of these factors is present here.

---

[19] The judicial description of the conduct of Mr. Prince's employees is quite illuminating and serves as but one example of the recklessness that pervaded the Blackwater companies. *See McMahon v. Presidential Airways, Inc.,* 502 F.3d 1331, 1337 (11th Cir. 2007) (describing Prince's pilots' fatal foray that deviated from announced flight plan into "a canyon of rapidly rising terrain, and while attempting to execute a 180-degree turn crashed into the face of a 16,580-foot mountain") (internal punctuation omitted).

### 1.    *This lawsuit does not challenge matters demonstrably and textually committed in the Constitution to the Executive Branch.*

Mr. Prince and his companies rest exclusively on the first test, arguing "national security and foreign relations" raise political questions. They then devote pages and pages to describing the State Department's contract. All of this argument is window-dressing for Mr. Prince's real argument, which finally surfaces on page 28: "Nor may the judiciary entertain tort claims based on any alleged failure of USTC [Blackwater] or individual ICs to comply with the standards specified by the State Department." No caselaw is cited in support of this proposition.

As a matter of law, Mr. Prince is simply wrong. The Court of Appeals for the Fourth Circuit's decision in *Tiffany v. United States*, 931 F.2d 271 (4th Cir. 1991) controls. There, the Court of Appeals for the Fourth Circuit in *Tiffany* had occasion to rule on claims brought not against a private party such as Mr. Prince, but against the Executive Branch (the military) itself.[20] The Court held that, if the conduct at issue violates federal statutes or formal published regulations, the judiciary has the power, and indeed the obligation, to exercise jurisdiction, even over Executive Branch officials. *Id.* at 280. The Court of Appeals explained the political question analysis turns on whether plaintiffs allege, as the plaintiffs did in *Berkovitz v. United States,* 486 U.S. 531 (1988), "that the government violated any *federal laws contained either in statutes or in formal published regulations such as those in the Code of Federal Regulations*." The Court went on to state "[t]here can be no doubt that the mandate of a federal statute is *a far*

---

[20] In *Tiffany*, the lawsuit was against the United States government itself, not against a for-profit corporation. The Court was asked to determine whether government employees could be held liable under a negligence theory despites having abided by the laws and standards governing their conduct. In essence, plaintiffs were seeking the imposition of a strict liability standard. 931 F.2d at 273-75. Here, as is evidenced by the federal criminal War Crimes Act, the judiciary is well-versed in ruling on whether lethal use of force was a permissible exercise, or a war crime. The standard by which to measure Blackwater's conduct is set out in that Act.

*stronger foundation for the creation of an action duty . . .than [an] administrative directive*." *Id.* (citations omitted).   Thus, if the Plaintiffs allege such violations, the federal courts have the obligation to entertain suit even as against the Executive Branch itself.

Here, of course, Plaintiffs allege Defendants committed war crimes, conduct prohibited by federal statute.  War Crimes Act, 18 U.S.C. § 2441(d)(1) (2006). And here, Plaintiffs are not suing the Executive Branch itself, but are suing a contractor alleged to have completely ignored any direction and guidance given by the State Department. *See, e.g., Abtan/617 Compl. ¶ 60.* These claims are justiciable, and do not intrude on any Executive prerogative, as is clearly evidenced by the Executive Branch's own use of the judicial branch.  *See United States v. Slough, et al.*, Case No. 1:08CR00360 (D.D.C. Dec. 4, 2009) (criminal proceeding against Mr. Prince's shooters for their culpability in the Nisur Square massacre pending before the District Court of the District of Columbia).

Mr. Prince and his companies rely essentially on a single case:  *Carmichael v. Kellogg, Brown & Root Servs., Inc.,* No. 08-14487, F.3d, 2009 WL 1856537 (11th Cir. June 30, 2009). There, the Court of Appeals found that the negligence claim brought against a contractor ended up being a negligence claim against the military.  On the facts there, the military, not the contractor, had decided when and how to send the vehicle.  The military controlled all aspects of the convoy, specifically, the date and time of departure, the speed, the decision to travel along a particular route, the amount of fuel to be transported, the number of trucks in the convey and the distance between each of the trucks.  The contractor was part of a specific military operation. That case thus falls on the same side of the line as the claims directly against the military alleged in *Tiffany*.  That case does not speak at all to whether the political question may be invoked for

- 53 -

claims of intentional wrongdoing that *violates* federal statutes and *violates* instructions and policies of the United States government.

The Courts of Appeal for the Eleventh Circuit has issued two other decisions rejecting the political question doctrine merely because the tort claims arose in the midst of the Iraq war. In *Lane v. Halliburton*, 529 F.2d 548, 558-560 (11th Cir. 2008), the Court denied defendants' motion to dismiss on political question grounds because the fact that the alleged acts were "set against the backdrop of United State military action in Iraq" does not necessarily implicate any decisions textually committed to the Executive, such as employing the use of force or deploying troops in a foreign land, nor does it constitute a "direct challenge [] to actions taken by a coordinate branch of government." *Id.* at 567.

In *McMahon v. Presidential Airways, Inc.,* 502 F.3d 1322 (11th Cir. 2007), the Eleventh Circuit affirmed the district court's rejection of Mr. Prince's political question defense.  The district judge reasoned, "Cases involving traditional tort liability – even if they relate to the military or occur during a time of war – are capable of judicial resolution.  The judicial standards required are no different than in ordinary tort actions; it is simply the context that has changed." *McMahon v. Presidential Airways, Inc.,* 460 F. Supp. 2d 1315, 1322 (M.D. Fla. 2006). The district court also saw significance in the "basic difference between questioning the military's execution of a mission and questioning the manner in which a contractor carries out its contractual duties."  *Id.* (citing *Smith v. Halliburton Co. (Smith I),* No. H-06-0462, 2006 WL 1342823 at *3 (S.D. Tex. 2006)).

### 2.   *None of the other five Baker factors is present.*

Although Mr. Prince and his companies argue only the "constitutionally committed" factor, it is worth nothing that none of the other five *Baker* factors is present here.  As noted

above, those factors are (1) the impossibility of deciding without an initial policy determination

of a kind clearly for nonjudicial discretion; (2) the impossibility of a court's undertaking

independent resolution without expressing lack of the respect due coordinate branches of

government; (3) an unusual need for unquestioning adherence to a political decision already

made; (4) the potentiality of embarrassment from multifarious pronouncements by various

departments on one question; and (5) judicially unmanageable need for discovery. *Baker v. Carr*,

369 U.S. 186, 217 (1962).

  ***First***, no initial policy determination is needed, as there is already a statute prohibiting

the conduct.  The War Crimes Act spells out the prohibited acts – intentional killing and

wounding civilians who are taking no part in hostilities.  *See* 18 U.S.C. § 2441(d)(1)(D) and (F)

(2006).  As such, there is a clearly-defined body of law prohibiting the conduct alleged.  *See,*

*e.g., Presbyterian Church of Sudan v. Talisman,* 244 F. Supp. 2d 289, 347 (S.D.N.Y. 2003)

(stating "the standards of behavior are… judicially ascertainable… which obviates the needs to

make initial policy decisions of the kind normally reserved for non-judicial discretion").

  ***Second***, hearing tort suits against private parties is a function constitutionally committed

to the judicial branch, and fulfilling that function is not disrespectful to the coordinate branches

of government.  Indeed, as noted above, the Executive Branch itself is using the judicial branch

to seek to punish Mr. Prince's men for their egregious misconduct.  Adjudication of this tort

action is well within the subject matter jurisdiction of this Court.  *See, e.g., Klinghoffer v. S.N.C.*

*Achille Lauro Ed Altri-Gestione*, 937 F.2d 44, 49 (2d Cir. 1991) (tort issues are "constitutionally

committed" to the judiciary).  Such claims do not present non-justiciable political questions

simply because they have foreign policy implications.  *See, e.g.*, *Flynn v. Shultz*, 748 F.2d 1186,

1191 (7th Cir. 1984), *cert. denied*, 474 U.S. 830 (1985) ("[a]n area concerning foreign affairs

that has been uniformly found appropriate for judicial review is the protection of individual or constitutional rights from government action."); *Koohi v. United States*, 976 F.2d 1328, 1332 (9th Cir. 1992) ("damage actions are particularly judicially manageable" and "are particularly nonintrusive.")

**Third,** there is no "unusual need for adherence to a political decision already made." *Baker*, 369 U.S. at 217. Adjudication of this case contravenes no existing political decision. The Department of Justice invoked the criminal jurisdiction of the District Court in the District of Columbia, which means the Executive Branch believes judicial adjudication of these issues is necessary and appropriate. *See also Kadic v. Karadzic,* 70 F.3d 232, 249 (2d Cir. 1995) (Executive Branch deeming judicial resolution important). Even if this Court were to reach a different result than the District Court in the District of Columbia, independent judicial examinations of the culpability of various parties are the hallmark of the United States' judicial integrity. Having two courts reach decisions on both the criminal and civil sanctions applicable to conduct does not constitute the type of undermining contemplated by *Baker v. Carr*.

**Fourth**, judicial resolution of Mr. Prince's liability for causing deaths and wounding would not contradict any prior decisions taken by other governmental branches. There has been no such decisions made. Indeed, as evidenced by the Congressional Letter appended as Exhibit E, the other branches of government are equally concerned about Mr. Prince's misconduct.

**Fifth** and finally, this tort action is clearly judicially discoverable and manageable. Courts have even found judicially discoverable and manageable standards to adjudicate *direct* challenges to *United States* military actions. *See Sterling v. Constantin*, 287 U.S. 378, 401 (1932) (suit brought by owners of oil and gas leasehold interests against military commanders

- 56 -

and others).  Here, there are scores of American and Iraqis eyewitnesses able to testify about

misconduct by Mr. Prince and his alter ego Blackwater companies.

**VII.    THE GOVERNMENT CONTRACTOR AFFIRMATIVE DEFENSE DOES NOT
          APPLY HERE.**

Mr. Prince and his companies ask this Court to dismiss the Complaints based on the

"government contractor defense." The affirmative defense was created by the Supreme Court in

*Boyle v. United Technologies Corp.*, 487 U.S. 500 (1988) and applied in the products-liability

context. The Supreme Court reasoned that a corporate contractor should not be liable under state

law for acting at the United States' behest if the United States itself would not be subject to suit

under the discretionary function exception to the Federal Tort Claims Act ("FTCA", 28 U.S.C. §

2680(a) (2006). *Boyle*, 487 U.S. at 512 (requiring the defendant establish, inter alia, that "the

United States approved reasonably precise specifications; the equipment conformed to those

specifications; and the supplier warned the United States about the dangers in the use of the

equipment that were known to the supplier but not to the United States.")  *See also In re Joint E.*

*& S. Dist. New York Asbestos Litig.*, 897 F.2d 626, 632 (2nd Cir. 1990) ("Stripped to its

essentials, the military contractor's defense under *Boyle* is to claim, 'The Government made me

do it.'").

The Court set narrow parameters, holding that the defense only applies if the contractor

cannot possibly comply with its contractual duties and the state-law imposed duties. *Boyle*, 487

U.S. at 508.   The defense does not apply even in "an intermediate situation, in which the duty

sought to be imposed on the contractor is not identical to one assumed under the contract, but is

also not contrary to any assumed." *Id.* at 509. As long as "[t]he contractor could comply with

both its contractual obligations and the state prescribed duty of care," state law will not generally

- 57 -

be pre-empted. *Id. See also Barron v. Martin-Marietta Corp.,* 868 F. Supp 1203, 1207 (N.D. Cal.

1994) (holding that the "requisite conflict exists only where a contractor cannot at the same time

comply with duties under state law and duties under a federal contract.")

    Mr. Prince and his companies cannot invoke this defense until Plaintiffs have had an

opportunity to conduct discovery. *Boyle*, 487 U.S. at 514 ("whether the facts establish the

conditions for the defense is a question for the jury"); *McMahon v. Presidential Airways, Inc.,*

502 F.3d 1331, 1354 (11th Cir. 2007) (stating that the *Boyle* court created "an affirmative

defense"); *Densberger v. United Technologies Corp*., 297 F.3d 66, 69 (2d. Cir. 2002) (upholding

the jury's finding that defendant "had not made out the elements of its various affirmative

defenses, one of which was the government contractor defense"); *Bailet v. MacDonnell Douglas

Corp.,* 989 F.2d 794, 802 (5th Cir. 1993) ("Because the government contractor defense is an

affirmative one, [defendant] bore the burden of proof to establish it.") *Ibrahim v. Titan Corp*.,

391 F. Supp. 2d 1, 17-18 (D.D.C. 2005).

    Plaintiffs are entitled to discover whether Mr. Prince and his men ignored the United

States' interests and served only their own motives.  Courts applying the *Boyle* doctrine have

been careful to ensure that the doctrine does not insulate contractors acting against the United

States' interests.[21] For example, in *Jama v. INS*, 334 F. Supp. 2d 662 (D.N.J. 2004), the district

court found the government contractor defense inapplicable to a contractor who ran a detention

---

[21] The government contractor defense is a creature of judge-made federal law, *Boyle*, 487 U.S. at 504, which is informed by principles of international law, including international human rights law. *See The Paquete Habana*, 175 U.S. 677, 700 (1900)("International law is part of our law, and must be ascertained and administered by the courts of appropriate jurisdiction as often as questions of right depending upon it are duly presented for their determination.") As such, it should be applied so as to conform with the United States' international obligations and commitments. *Murray v. The Schooner Charming Betsy*, 2 Cranch 64, 118 (1804)("an act of Congress ought never to be construed to violate the law of nations if any other possible construction remains.")

facility for asylum applicants because the alleged tortuous conduct violated certain contract terms and the duty to keep the detainees safe. The district court held "[i]t would defy logic to suggest that the INS could have 'approved' practices that breached this larger duty." *Id.* at 689. The evidence to date strongly suggests that Defendants did not act to benefit the United States. *See Ridgeway Proffer ¶ 8-15* (detailing the firing of multiple rounds of weapons from assault rifles and the launch of an M-203 grenade without justification at civilians and civilian vehicles, causing the death of civilians who posed no threat to the convoy, the injury to such individuals and harm to civilian property).

If the Court were inclined to treat Mr. Prince's motion to dismiss as a motion for summary judgment under Fed.R.Civ.P. 26, Plaintiffs respectfully advise the Court that they need to conduct discovery, and stand willing to submit supportive briefing to establish the factors set forth in Fed.R.Civ.P. 56.

## VIII.   THE UNITED STATES' ABSOLUTE IMMUNITIES DO NOT PROTECT MR. PRINCE AND HIS BLACKWATER COMPANIES.

Mr. Prince and his companies assert that they are entitled to "absolute immunity" from the Plaintiffs' claim for negligent hiring if they exercised discretion and thus are not entitled to the government contractor defense. *Prince Mem.* at 39. First, as noted above, this Court is not yet able to rule on whether Mr. Prince and his companies may invoke the government contractor defense.

Second, if they are not entitled to invoke the government contractor defense because they did not act as directed by the United States, they are not therefore entitled to absolute immunity. Such reasoning by Mr. Prince and Blackwater ignores the controlling caselaw. Absolute immunity is granted to federal officials when the public benefit gained by granting immunity to

- 59 -

the contractor outweighs the harm to individuals. *Mangold v. Analytic Servs.*, 77 F.3d 1442,

1446 (4th Cir. 1996); *Westfall v. Erwin*, 108 S.Ct. 580, 583 (1988) ("Absolute immunity for

federal officials is justified only when the contributions of immunity to effective government in

particular contexts outweigh the perhaps recurring harm to individual citizens.") (*citing Doe v.

McMillan*, 93 S.Ct. 2018, 2028 (1973)).

There has been one instance in this Circuit when the Court of Appeals found that

extending absolute immunity to private contractors within the "narrow circumstances where the

public interest in efficient government outweighs the costs of granting such immunity."

*Mangold*, 77 F.3d at 1447. There, the contractor wanted immunity for a statement made in a

government investigation. The court found significant public benefit in preserving the

government's ability to investigate fraud, waste, and mismanagement in administration of

government contracts, preserving and encouraging government efficiency. *Mangold*, 77 F.3d at

1447. "In the absence of a privilege . . . . the exposure to tort lawsuits would chill government-

sponsored investigatory and adjudicatory efforts, threatening to undermine their reliability and

therefore to erode confidence in the judicial function of government. Those negative

consequences would far outweigh the benefit of giving individuals a right of redress for false

testimony." *Mangold*, 77 F.3d at 1449. This rationale is inapposite in the present context. In

fact, the reverse is true: the *presence* of immunity would chill government-sponsored

investigatory and adjudicatory efforts, threatening to undermine their reliability and therefore to

erode confidence in the judicial function of government. These negative consequences would far

outweigh the benefit of giving the defendants absolute immunity, especially considering the

tragic harm done by Mr. Prince and Blackwater's negligence in the past. *See* Andrew Finkelman,

*Suing The Hired Guns: An Analysis of Two Federal Defenses to Tort Lawsuits Against Military*

*Contractors*, 32 Brooklyn J. Int'l. L. 395 n.124 (2009) ("Research discloses no case that has so extended the principle announced in *Mangold* outside of the government investigation or financial intermediary context.").

Even in the context of government officials, the Supreme Court counsels restraint in granting immunity. "Official immunity comes at great cost. An injured party with an otherwise meritorious claim is denied compensation simply because he had the misfortune to be injured by [an entity with immunity]. Moreover, absolute immunity contravenes the basic tenet that individuals be held accountable for their wrongful conduct." *Westfall v. Erwin,* 108 S. Ct. 580, 583 (1988). *See also Mangold,* 77 F.3d at 1446-47 (internal citations omitted) (finding that absolute immunity "tends to undermine the basic tenet of our legal system that individuals be held accountable for their wrongful conduct").

In sum, Defendants' arguments about immunity are wholly premature.  Defendants concede that this Court cannot rule on the immunity argument until the Court rules on the application of the *Boyle* government contractor defense.  *Prince Mem.* at 39.  As a result, these arguments must await the appropriate procedural stage – namely, motions for summary judgment filed after Plaintiffs have been permitted discovery.

### IX. IT IS PREMATURE TO RULE ON CHOICE OF LAW ISSUES.

These lawsuits all allege a broad pattern of misconduct by Mr. Prince and his heavily-armed men.  The Complaints allege that Mr. Prince and his web of companies have "a pattern and practice of recklessness in the use of excessive and deadly force" (*Abtan/617 Compl.  ¶ 49*; *Albazzaz/616 Compl. ¶¶ 14,18*; *Hassoon/618 Compl. ¶ 81*; *Rabea/645 Compl. ¶¶ 13,16; Sa'adoon/615 Compl. ¶ 25*);  hires those known to be violent (*Abtan/617 Compl.  ¶ 53*; *Albazzaz/616 Compl. ¶ 23*; *Hassoon/618 Compl. ¶ 83*; *Rabea/645 Compl. ¶ 14; Sa'adoon/615*

- 61 -

*Compl.* ¶ *28); sends out heavily-armed men who are on drugs* (*Abtan/617 Compl.* ¶ *51*;

*Albazzaz/616 Compl.* ¶ *19*; *Hassoon/618 Compl.* ¶ *81*; *Rabea/645 Compl.* ¶ *17; Sa'adoon/615*

*Compl.* ¶ *26); destroys evidence establishing wrongdoing* (*Abtan/617 Compl.* ¶ *63*;

*Albazzaz/616 Compl.* ¶ *21*; *Hassoon/618 Compl.* ¶ *87*; *Rabea/645 Compl.* ¶ *19; Sa'adoon/615*

*Compl.* ¶ *32*), creates a corporate culture in which excessive and unnecessary use of deadly

force by its employees is not investigated or punished in any way, and sends a clear message to

the men that they can act with impunity (*Abtan/617 Compl.* ¶ *50*; *Albazzaz/616 Compl.* ¶ *14*;

*Hassoon/618 Compl.* ¶ *81*; *Rabea/645 Compl.* ¶¶ *13; Sa'adoon/615 Compl.* ¶ *25*).

     This Court hears these Complaints under federal common law.  Plaintiffs allege both

federal question (RICO, ATS) and diversity jurisdiction.[22]  These Complaints allege a course

of conduct culminating in death and destruction.  The conduct at issue primarily occurred in

three locations:  Virginia, North Carolina, and Iraq.

     First, Virginia is the home base of Mr. Prince, who is the kingpin of the wrongdoing

alleged by Plaintiffs and the exclusive beneficiary of the illicit proceeds.  Mr. Prince maintains

offices in the Tysons Corner area, and a home in McLean, Virginia.  Although discovery will

be needed to establish the details, the Plaintiffs believe Mr. Prince spends a substantial amount

of time in Virginia, and likely made some of the egregious decisions to deploy armed men

---

[22] Plaintiffs are all citizens of Iraq, as is conveyed by the many allegations that they are "Iraqis."
*See, e.g., Rabea/645 Compl.* ¶*5.*  Defendants claim Greystone is a foreign entity.  Although
Plaintiffs are willing to dismiss Greystone to preserve diversity jurisdiction if necessary,
Plaintiffs ask that they be permitted discovery sufficient to establish that Greystone is not an
actual legal entity.  Plaintiffs submit (supported with *Decl. John Doe No. 2* ¶ *7*) that Greystone
is merely one of Mr. Prince's alter egos, and does not adhere to any of the necessary corporate
formalities needed to create a separate legal entity.  The documents obtained from Barbados
support this position.

known to be on steroids, permit the use of hand grenades, sell weapons on the black market, and destroy evidence while he was physically in Virginia.

Second, Plaintiffs believe discovery also will show a significant amount of Mr. Prince's wrongdoing occurred in North Carolina. Mr. Prince's second-in-command, Gary Jackson (identified in Ms. Simons' book as the target of an ongoing federal investigation),[23] kept his offices in Moyock, North Carolina. That was also the location of the recruiting, hiring and training operations. There, Mr. Prince's subordinates destroyed documents and took other steps to evade detection. Plaintiffs believe Mr. Prince frequently spends time in the North Carolina offices.

Third, the deadly results of Mr. Prince and his companies' wrongdoing are located in Baghdad and elsewhere in Iraq. There, children were forced to watch their parents gunned down by Mr. Prince's men while they were driving together as a family. *Hassoon/618 Compl. ¶ 51.* There, a mother was forced to watch her nine-year old son mowed down and killed by gunfire from Mr. Prince's men as she unsuccessfully tried to shield her infant. *Hassoon/618 Compl. ¶ 53.*

In this context, it is premature for the Court to rule on the appropriate choice-of-law to inform the jury instructions. The better course may be to await the close of discovery, and have the parties brief the answers to the choice-of-law question based on the record evidence rather than on the Complaints' allegations.

---

[23] See Simons, Suzanne, *The Master of War*, at 264, stating that Mr. Jackson received a target letter from the Federal Bureau of Investigation.

- 63 -

### A. Iraqi Law May Be Applied and Does Not Bar These Claims.

What can easily be decided now, however, is that Iraqi law may be applied by this

Court, and that Iraqi law does not bar Plaintiffs' claims.  Defendants claim Plaintiffs lack the

ability to seek redress for the killings and woundings for two reasons:  First, Mr. Prince and his

companies argues that the CPA Order 17 (issued June 2003; updated June 27, 2004) (the

"Bremer Order") prevents Plaintiffs from bringing suit.  Second, Mr. Prince hired an American

lawyer who has never practiced law in Iraq and is not a native Arabic speaker.[24]  Based on an

opinion provided by this American lawyer, Defendants claim Iraqi courts would slam their

courthouse doors shut were the Iraqi Plaintiffs to seek to sue in Iraq.

### 1. The Bremer Order contemplates lawsuits such as these proceeding in United States' courts.

Mr. Prince's arguments fail.  First, on the Bremer Order, Plaintiffs are before this

Court, located far from Iraq but convenient to Mr. Prince's offices and home, because the

Bremer Order protected American contractors from being hailed into Iraqi courts. Mr. Prince

and Blackwater have misread the Bremer Order as forbidding this Court from applying Iraqi

law.  The Bremer Order actually says the opposite:  It states that contractors are not exempt

from Iraqi substantive tort law. (CPA Order 17, § 4(4) (June 27, 2004).  Note, Defendants are

not "Coalition Personnel," as defined in Section 1(1) of the Bremer Order since they are not

"forces employed by a Coalition State" or "assigned to, or under the direction or control of the

---

[24] Several of Plaintiffs' Iraqi experts know Defendants' expert.  He is the son of two Iraqis who
fled the country years ago, and raised him here in the United States.  His Arabic is a bit "broken"
according to our experts, which is to be expected given his circumstances.  He travels with some
frequency to Iraq, but he lives in the United States.

Administrator of the CPA."[25] Rather, Defendants qualify as a "Coalition Contractor," who is "supplying goods and/or services to or on behalf of Coalition Forces or the CPA under contractual arrangements." *Id*. § 1(5).

Accordingly, the Order's statement that "occupying powers, including their… personnel" are not subject to Iraqi law does not apply to Mr. Prince and his men.  Contractors are required to "respect relevant Iraqi laws." *Id.* § 4(4).  Further and importantly, the Order is "***without prejudice to the exercise of jurisdiction by the Sending State and the State of nationality of a Contractor in accordance with applicable laws***." CPA Order 17 (Revised), Sec. 4(4), 4(7) (June 27, 2004)(emphasis added).

### 2.    *Iraqi law permits Plaintiffs' claims*.

Second, Iraqi substantive law permits Plaintiffs' claims, including their claims for punitive damages, to be brought.  Mr. Prince's expert on Iraqi law, Haider Ala Hamoudi, failed to interpret accurately the relevant sections of the Iraqi civil code. He incorrectly refers to Article 213 of the Iraqi Civil Code.  He likely meant to refer to Article 219, which expressly deals with vicarious liability.[26] The first section of that Article says "the government, municipalities and other institutions performing a public service, and any person exploiting one of the industrial or commercial institutions are liable for the damage caused by their employees, if the damage is the result of a violation perpetrated while carrying out their services." *See Exhibit K,* Declaration of Dr. Aziz Jawad Hadi. However, vicarious liability is in *no way* limited by this provision. In fact, according to Dr. Saleem Abdullah Al Juboori, "the person injured as a result of an act

---

[25] Section 1(1)'s inclusion of "civilians" in the definition of "Coalition Personnel" refers to civilian employees of the U.S. Government, not to independent contractors.
[26] For the Court's reference, we have included a translation of Articles 202-220 of the Iraqi Civil Code as Exhibit M.

perpetrated by a private company working in Iraq, has the choice of instituting a legal proceeding against the persons who caused him damage or against the company itself being liable for the acts of its employees…" *See Exhibit J.*

Mr. Prince's American expert seems to believe that Iraqi plaintiffs must allege some sort of relationship between the defendant and the Iraqi government in order to seek vicarious liability. He is incorrect.  As explained by the Iraqi jurists who actually practice law in Iraq, although the first part of the first sentence of Article 219 refers specifically to governments and municipalities, the section goes on to apply to "any person exploiting one of the industrial or commercial institutions." This is no way limited to government ventures. One expert, Dr. Al Juboori, explains as follows: "There is no restriction limiting the institution of a legal proceeding against a specific type of companies [sic] whether it is connected by a contract with the government only or with other parties." *See Exhibit J*, Declaration of Dr. Saleem Abdullah Al Juboori; s*ee also Exhibit K,* Declaration of Dr. Aziz Jawad Hadi.

The opinions of Plaintiffs' experts are in accord with the expert testimony, and subsequent court rulings in *Baragona v. Kuwait Gulf Link Transfer Company*, No. 1:05-cv-1267-WSD, 2007 U.S. Dist. LEXIS 81804 (N.D.G.A. November 5, 2007).[27]  There, a federal district court in Georgia reviewed an opinion by two Iraqi law experts ("*Baragona* Expert Opinion"),[28] and held that a foreign company in contract with the United States to provide services in Iraq could be held vicariously liable under Iraqi law. *Id*. at 6-7.

---

[27] The award was later vacated by the court on grounds not relevant to this matter.
[28] There, Plaintiffs submitted reports from Judge Raid Juhi Hamadi Al-Saedi, a former Iraqi judge, and Dr. Abdullah F. Ansary, a Saudi professor of law with degrees from Harvard University and the University of Virginia. That report is attached as Exhibit N.

Mr. Prince's American expert also erred in failing to acknowledge the broad discretion of the Iraqi judiciary to award damages, including punitive or "moral" damages. Iraq's Code of Cassation ruled in Ruling No. 185 of 31 July 1968, no. 185, *Huquqiyah*, 1968 that any damage incurred by a damaged party shall be taken into account when determining damages, *regardless of the type of damage*.

### 3. *This Court has the power to ensure Plaintiffs have a remedy*.

Because Iraqi law provides Plaintiffs a remedy on the facts alleged here, the Court may decide to borrow that law for purposes of developing the federal common law applicable to this matter. But the Court is also free to ignore Iraqi law if it believes application of such law contravenes the public policy. Although Virginia uses the *lex loci delicti* doctrine, the state courts are not bound to apply the laws where the injury occurred if doing so would violate public policy or the interests of the forum state. *See Va. Pract. Products Liability*, § 12:8 (2009); *See Dreher v. Budget Rent-A-Car System, Inc.*, 634 S.E.2d 324, 330 (Va. 2006); *Toler v. Oakwood Smokeless Coal Corp.*, 4 S.E.2d 364, 368 (Va. 1939); *C.I.T Corp. v. Amy Andrews Guy*, 195 S.E. 659 , 661 (Va. 1938); *Terry v. June*, 420 F.Supp.2d 493, 506 (W.D. Va. 2006). "Comity does not require application of another state's substantive law if it is contrary to the public policy of the forum state." *Williard v Aetna Case. & Sur. Co.*, 193 S.E.2d 776, 778 (Va. 1973). The court in *Maryland v. Coard* stated that test for the public policy exception is, whether the foreign statute is "contrary to the known policy, or prejudicial to the interest, of the state in which the suit is brought." 9 S.E.2d 454, 457 (Va. 1940). In *Toler*, the court applied the public policy exception because after noting that bigamy in Virginia was a criminal offense that was punishable by imprisonment. 4 S.E.2d at 368. Likewise, here, if the Iraqi courts would allow Mr. Prince to go

- 67 -

unpunished for acts that are chargeable as murder in Virginia, this Court may employ the public policy exception to the doctrine.

### B.  *None of the Plaintiffs Lacks Capacity To Sue.*

Mr. Prince and his companies assert that several plaintiffs lack the capacity to sue since they are heirs of estates. Two Iraqi Codes explicitly deal with who is entitled to be a party in a lawsuit and both of them ***permit*** family members to pursue legal action. Iraqi Code of Civil Procedure No. (83) of 1969 defines which parties have the right to seek a legal remedy. Iraqi Law of Personal Status No. (188) of 1959 deals with the rights of heirs in cases such as this. *See Baragona* Expert Opinion. Under Iraqi law, an heir can be a party to a civil action brought against or for the deceased. *See Baragona* Expert Opinion. Article 5 of the Iraqi Code of Civil Procedure states "It is legally valid that one of the heirs can be adversary in the lawsuit for or against the dead…" *Id.* More specifically, in determining who is an heir, Article 89 of Iraqi Law of Personal Status defines heirs as "parents and the children…grandfathers, grandmothers, brothers and sisters and nephews and sister, uncles, aunts (on father's side), uncles and aunts (on mother's side)… etc." *See Bargona* Expert Opinion. As family members of the deceased, there is nothing under Iraqi law barring plaintiffs from bringing suit as heirs to the estates of their family members.[29]

Further, the Estate Plaintiffs have obtained an order appointing an administrator to represent their interests in Virginia.  They stand ready to amend the Complaint to name the administrator if the Court rules that Virginia law governs, and such an amendment should be made.

---

[29] Furthermore, under Virginia law, an administrator has been appointed by the Circuit Court in Alexandria to represent the estates of all the victims.

### C.   *Discovery is Needed Before The Court Rules on Whether Any Plaintiffs are Time-Barred.*

This Court should apply federal common law to resolve these lawsuits.  Common law necessarily borrows some procedural rules from its host jurisdiction.  But rules should be borrowed only when they are truly procedural, and will not impact substantive questions.  The distinction between "substantive" and "procedural" is not always clear.  *Guaranty Trust v. York*, 326 U.S. 99, 108 (1945) ("'[S]ubstance' and 'procedure' are the same key words to very different problems…  Each implies different variables depending upon the particular problem for which it is used.").  The statute of limitations is generally considered procedural, but a number of courts have recognized exceptions.  *Knauer v. Johns-Manville Corp.*, 638 F. Supp. 1369 (D. Md. 1986) (finding the period of limitations for filing a wrongful death claim to be "a substantive provision rather than a procedural one").  In addition, the Supreme Court has held that in diversity cases, state tolling rules that are "integral" to state statutes of limitations should govern; *Bynum v. Houdaille Indus.*, No. WC85-257-LS-D, U.S. Dist. LEXIS 20031 (D. Miss. 1986) (finding that the statute of limitations should be considered substantive when it is "built in" or "in the same enactment as" the state statute that created the right of action).  *Walker v. Armco Steel Corp.*, 446 U.S. 740, 750-51 (1980).  *See also Wade v. Danek Med., Inc.,* 182 F.3d 281, 289 (4th Cir. 1999) ("[I]n any case in which a state statute of limitations applies – whether because it is 'borrowed' in a federal question action or because it applies under *Erie* in a diversity action – the state's accompanying rule regarding equitable tolling should also apply."); *Converse v. General Motors Corp.*, 893 F.2d 513, 516 (2d Cir. 1990) (finding the state statute of limitations controlling in a diversity action); *Hart v. Bates*, 897 F. Supp. 710, 718 (E.D.N.Y 1995) (holding that state rule on the tolling of the statute of limitations should prevail).  This is

particularly true where the statutes of limitations are "outcome-determinative." *Wade*, 182 F.3d at 288 (citing *Guaranty Trust*, 326 U.S. at 109).

Here, the Court is being asked to apply Virginia statute of limitations to bar Plaintiffs' claims. Yet Mr. Prince and his companies concede as they must that the relevant Iraqi statute would not bar the claims. In addition, although not briefed at all by Defendants, the other laws of the other potentially relevant jurisdiction, North Carolina, would not bar the claims. That state has a specific tolling statute for persons caught in a war zone: "[w]hen a person is an alien subject, or a citizen of a country at war with the United States, the time of the continuance of the war is not a part of the period limited for the commencement of the action." N.C. Gen Stat. § 1-34 (2008).

In sum, Mr. Prince and his companies are trying to invoke substantive law from Iraq that they believe (erroneously) bars Plaintiffs' claims, and simultaneously invoke procedural law from Virginia to serve as a time bar to some of Plaintiffs' claims. Such outcome determinative selection of law should not be countenanced.

### D. Even if Virginia Statutory Law Applies, Plaintiff Wijdan Mohsin Saed is Not Time-Barred.

If the Court looks to Virginia procedural law, certain non-minor Plaintiffs may be time-barred. Virginia has a two-year statute of limitations for personal injuries (Va. Code Ann. § 8.01-243(A)) and for wrongful death actions (*id.* § 8.01-244). That limitation is clearly subject to tolling by equitable estoppel or fraudulent concealment. *Overstreet v. Kentucky Cent. Life Ins. Co.*, 950 F. 2d 931 (4th Cir. 1991). The essential elements of equitable estoppel under Virginia law are clearly stated in *T ... v. T ...*, 224 S.E.2d 148, 152 (Va. 1976): "absent a showing of fraud and deception, ... a representation, reliance, a change of position, and detriment" (citing *United*

- 70 -

*States v. Fidelity and Casualty Co. of New York*, 402 F.2d 893, 898 (4th Cir. 1968)). According

to the Fourth Circuit in *C.M. English v. Pabst Brewing Co.,* 828 F.2d 1047, 1049 (4th Cir. 1987),

"[t]he statute of limitations will not be tolled on the basis of equitable estoppel unless the

employee's failure to file in timely fashion is the consequence either of a deliberate design by the

employer or of actions that the employer should unmistakably have understood would cause the

employee to delay filing his charge." (quoting *Price v. Litton Business Sys., Inc.,* 694 F. 2d 963,

965 (4th Cir. 1982)). There does not need to be an element of fraud. The Fourth Circuit stated

that it is "sufficient that the aggrieved party reasonably relied on the words and conduct of the

person to be estopped in allowing the limitations period to expire." *City of Bedford v. James

Leffel & Co*., 558 F.2d 216, 218 (4th Cir. 1977).

One Plaintiff, Wijdan Mohsin Saed, the widow of Mr. Sa'adoon, has alleged facts

sufficient to toll the statute under equitable estoppel and equitable tolling doctrines.  Plaintiff

Saed has alleged that she was wrongfully deceived and misled by Mr. Prince and his companies

into believing she would receive compensation for the death of her husband.  *Sa'adoon/615

Compl*. ¶ 24.  This deception caused delay and preventing Plaintiff's diligent pursuit of her

claim. *C.M. English,* 828 F.2d 1048.

### CONCLUSION

Clearly contrary to United States policy and law, Mr. Prince intentionally and knowingly

had many innocent Iraqis killed for profit and to further his own views on Christian supremacy

over the Islamic faith.  Such conduct cannot be beyond the reach of the federal judiciary.  Indeed,

such an adjudication is expressly contemplated by the Bremer Order immunizing Mr. Prince and

his Blackwater companies from the reach of Iraqi courts.  This Court need not look far afield to

find the appropriate standards to provide the jury as they consider Mr. Prince's conduct.  Those

standards are enshrined in federal criminal law, such as RICO and the War Crimes Act.

Plaintiffs respectfully request that this Court deny Mr. Prince's motion to dismiss, and order

discovery to commence.

Respectfully submitted,

_____/s/ Susan L. Burke_____

Susan L. Burke (Virginia Bar No. 27769)
William T. O'Neil
William F. Gould (Virginia Bar No. 428468)
BURKE O'NEIL LLC
1000 Potomac Street
Washington, DC 20007
Tel: (202) 445-1409
Fax: (202) 232-5514
sburke@burkeoneil.com
*Attorneys for All Plaintiffs*


Katherine Gallagher (application for *pro hac vice*
pending)
CENTER FOR CONSTITUTIONAL RIGHTS
666 Broadway, 7th Floor
New York, NY 10012
*Attorney for Abtan and Albazzaz Plaintiffs*


Date: August 3, 2009