# EXHIBIT H

IN THE UNITED STATES DISTRICT COURT FOR

THE EASTERN DISTRICT OF VIRGINIA

- Alexandria Division -

| | |
|---|---|
| IN RE: BLACKWATER ALIEN TORT CLAIMS ACT LITIGATION | Case No. 1:09-cv-615<br>Case No. 1:09-cv-616<br>Case No. 1:09-cv-617<br>Case No. 1:09-cv-618<br>Case No. 1:09-cv-645<br>(consolidated for pretrial purposes) (TSE/IDD) |

### DECLARATION OF JOHN DOE NO. 2

I hereby declare to the following under penalty of perjury:

1. I am an American citizen. The information set forth below has been provided in grand jury proceedings convened by the United States Department of Justice.

2. I was employed by Erik Prince and his web of companies for approximately four years.

3. I am providing this Declaration as "John Doe No. 2" because I fear violence against me in retaliation for submitting this Declaration. On several occasions after my departure from Mr. Prince's employ, Mr. Prince's management has personally threatened me with death and violence. In addition, based on information provided to me by former colleagues, it appears that Mr. Prince and his employees murdered, or had murdered, one or more persons who have provided information, or who were planning to provide information, to the federal authorities about the ongoing criminal conduct.

4. Erik Prince personally created and controls the various corporate entities named as Defendants in this lawsuit (collectively referred to as "Prince companies"). Mr. Prince

and those of us who were employed by the various Prince companies did not observe any corporate formalities or otherwise operate any of the Prince companies as independent entities. Instead, the Prince companies all operated as a single company.

5. We all worked for Mr. Prince, and his top manager, Gary Jackson. These two men personally oversaw and operated all of the Prince companies.

6. Mr. Prince created and operated this web of companies in order to obscure wrongdoing, fraud and other crimes.

7. For example, Mr. Prince transferred funds from one company (Blackwater) to another (Greystone) whenever necessary to avoid detection of his money laundering and tax evasion schemes.

8. Mr. Prince and his companies failed to keep any accurate books or accountings by separate entity. Mr. Prince treated all the revenues flowing in to the Prince companies as fungible and within his complete and absolute personal control. Mr. Prince contributed his personal wealth to fund the operations of the Prince companies whenever he deemed such funding necessary. Likewise, Mr. Prince took funds out of the Prince companies and placed the funds in his personal accounts at will.

9. Mr. Prince is motivated to engage in misconduct by two factors: First, he views himself as a Christian crusader tasked with eliminating Muslims and the Islamic faith from the globe.

10. To that end, Mr. Prince intentionally deployed to Iraq certain men who shared his vision of Christian supremacy, knowing and wanting these men to take every available opportunity to murder Iraqis. Many of these men used call signs based on the Knights of the Templar, the warriors who fought the Crusades.

11. Mr. Prince operated his companies in a manner that encouraged and rewarded the destruction of Iraqi life. For example, Mr. Prince's executives would openly speak about going over to Iraq to "lay Hajiis out on cardboard." Going to Iraq to shoot and kill Iraqis was viewed as a sport or game. Mr. Prince's employees openly and consistently used racist and derogatory terms for Iraqis and other Arabs, such as "ragheads" or "hajiis."

12. Second, Mr. Prince is motivated by greed. He sought every opportunity to deploy men to Iraq in order to earn more money from the United States government. Mr. Prince and his top manager Gary Jackson knew the men being deployed were not suitable candidates for carrying lethal weaponry, but did not care because deployments meant more money.

13. Mr. Prince ignored the advice and pleas from certain employees, who sought to stop the unnecessary killing of innocent Iraqis. Certain employees located overseas refused to deploy unfit men and instead sent them back to the United States, advising that they were unfit to deploy for various reasons. These reasons included the men (a) making statements about wanting to deploy to Iraq to "kill ragheads" or achieve "kills" or "body counts," (b) excessive drinking, (c) steroid use, and (d) failure to follow safety and other instructions regarding lethal weaponry. When these demonstrably unfit men were returned to the United States, Mr. Prince and his executives would send them back to be deployed in Iraq with an express instruction to the concerned employees located overseas that they needed to "stop costing the company money."

14. Mr. Prince also repeatedly ignored the assessments done by mental health professionals, and instead terminated those mental health professionals who were not willing to endorse deployments of unfit men.

15. Mr. Prince and Mr. Jackson hid from Department of State the fact that they were deploying men to Iraq over the objections of mental health professionals and security professionals in the field.

16. Mr. Prince obtained illegal ammunition from an American company called LeMas. This company sold ammunition designed to explode after penetrating within the human body. Mr. Prince's employees repeatedly used this illegal ammunition in Iraq to inflict maximum damage on Iraqis.

17. Mr. Prince made available to his employees in Iraq various weapons not authorized by the United States contracting authorities, such as hand grenades and hand grenade launchers. Mr. Prince's employees repeatedly used this illegal weaponry in Iraq, unnecessarily killing scores of innocent Iraqis.

18. Mr. Prince knowingly hired two persons who were previously involved in the Kosovo sex trafficking ring to serve at relatively high-levels within his companies.

19. Mr. Prince travelled repeatedly to Iraq, and frequently visited the Blackwater "Man Camp" during his trips overseas. Mr. Prince failed to stop the ongoing use of prostitutes, including child prostitutes, by his men.

20. Mr. Prince's North Carolina operations had an ongoing wife-swapping and sex ring, which was participated in by many of Mr. Prince's top executives. This sex ring ended up causing so many disputes amongst Mr. Prince's executives that Mr. Prince directed his employee Joseph Schmidt to investigate and prepare a report.

21. Mr. Prince generated substantial revenues from participating in the illegal arms trade. Using his various companies, he procured and distributed various weapons, including unlawful weapons such as sawed off semi-automatic machine guns with silencers,

through unlawful channels of distribution. For example, Mr. Prince and his employees arranged for the weapons to be polywrapped and smuggled into Iraq on Mr. Prince's private planes, which operated under the name Presidential Airlines.

22. Mr. Prince hid the revenue from his illegal weapons trade with assistance from an employee willing to engage in criminal conduct, Carol Confers. Those who were not willing to assist Mr. Prince with his illegalities tended not to remain with the companies. For example, Roy Mettinger resigned as Chief Financial Officer, stating he was not willing to go to jail for Erik Prince.

23. Mr. Prince feared, and continues to fear, that the federal authorities will detect and prosecute his various criminal deeds. On more than one occasion, Mr. Prince and his top managers gave orders to destroy emails and other documents. Many incriminating videotapes, documents and emails have been shredded and destroyed.

Executed on 29th of July 2009

_____
John Doe No. 2